**FIRST STATE BANK, BELMOND, Iowa, Appellant,**

v.

**Loren E. KALKWARF, Alberta J. Kalkwarf, Alfred Klooster, and Michael D. Barkela, Appellees.**

No. 91–1140.

Supreme Court of Iowa.

Feb. 17, 1993.

As Corrected Feb. 26, 1993.

James E. Houser of Houser & Berkland, Belmond, for appellant.

Mark S. Brownlee of Kersten & Carlson, Fort Dodge, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, NEUMAN, and SNELL, JJ.

HARRIS, Justice.

A mortgage foreclosure proceeding became a priority dispute between a bank lender and a judgment creditor of the borrower. The bank appeals and the judgment creditor cross-appeals from the trial court's resolution of the dispute. We affirm on both appeals.

The crucial background facts were carefully detailed by the trial court in its ruling. In the following paragraphs, with minor editorial changes, we adopt those findings as our own.

Loren and Alberta Kalkwarf, husband and wife, are farmers. The First State Bank of Belmond (the bank) is a bank in a small rural community. Loren Kalkwarf and George Hinman (Hinman), president of the bank, have known each other since they were children and are distantly related through marriage.

The bank and the Kalkwarfs have done business together for many years. Since at least 1980, the bank has maintained a senior security interest, by way of a uniform commercial code filing, in all the crops and equipment of the Kalkwarfs. Prior to the execution of the subject mort-

gage on July 31, 1986, this constituted the only form of security ever required by the bank in connection with the Kalkwarfs' indebtedness.

On June 24, 1986, a judgment for $66,-733.02 was entered in favor of Alfred Klooster against Loren Kalkwarf in Hancock County.[1] Alberta Kalkwarf was not a party in that litigation. After the bank became aware of the Klooster judgment, a member of the bank's credit committee reviewed the Kalkwarfs' file and concluded that even without the Klooster judgment, but more so with it, the Kalkwarfs had an inverted credit position. That is, their current debts exceeded their current assets.

At the credit committee's suggestion, Hinman and Loren discussed the judgment and the bank's desire for additional security. At this time—July 1986—the Kalkwarfs were indebted to the bank for $58,-000 from preceding loans. The preceding February Loren had signed a financial statement at the bank indicating he and his wife had a net worth in excess of $715,000. Loren readily agreed to give the bank a first mortgage on his undivided one-half remainder interest in a Wright County farm.

On July 31, 1986, the Kalkwarfs executed a $40,000 promissory note to the bank, secured by a mortgage on Loren's interest in the Wright County land. The mortgage was duly recorded and then rerecorded on August 8, 1986, when it was discovered there had been an error in the description. At the time of the giving of the note and mortgage, the bank disbursed $14,250 to the Kalkwarfs, $13,500 of which was given back to the bank to pay off an unsecured debt the Kalkwarfs owed.

On September 3, 1986, the Klooster judgment was certified to Wright County. *See* Iowa Code § 624.24 (1991). On January 28, 1987, Loren went to see Hinman and showed him a notice of sheriff's sale and dictation to the sheriff which had been issued pursuant to a general execution upon the Klooster judgment. These documents constituted actual notice to the bank that legal action was being pursued to enforce the Klooster judgment lien against the Wright County real estate.

A loan comment, dated January 28, 1987, indicates that the bank was aware that Loren had transferred most of his assets to Alberta prior to the rendering of the Klooster judgment. The bank also knew the reason for doing so was to avoid collection of the Klooster judgment.

The giving of the mortgage suited Loren. He was bitter about the Klooster judgment; he stated he would do anything he could to defeat a recovery on it. It was for that reason that Loren had transferred most of his property to his wife. He recognized that a mortgage to the bank would diminish the opportunity for the judgment creditor to recover by levying on this property. Loren was not shy in expressing this. On several occasions in the latter part of 1987 and early 1988, he discussed the concept of a "friendly foreclosure" with the bank. It is clear from the loan file comments that the sole purpose of the proposed "friendly foreclosure" was to "get rid of Klooster or his interest in the land" so that the bank could ultimately "sell it back to Alberta."

The bank discussed this possibility with its counsel. Although the bank's attorney advised that it was legal to have a "friendly foreclosure," the bank decided not to be a party to such a transaction. The bank only foreclosed two years later when the Kalkwarfs defaulted for a second time and refused to bring a promissory note current or to make future payments.

On January 30, 1987, the Kalkwarfs gave separate financial statements to the bank. The statements indicated a decrease in the Kalkwarfs' combined net worth from a positive $715,000 to a positive $110,000.[2] Lor-

---

**1.** The "Klooster judgment" was assigned to Michael D. Barkela prior to the commencement of this foreclosure action. Notwithstanding the assignment, the parties, the district court, and therefore we, refer to it as the "Klooster judg-

ment." For convenience Klooster and Barkela will be referred to as Klooster.

**2.** Economic conditions faced by farmers in the 1980s were largely to blame. The trial court explained:

en's net worth was negative; Alberta's was positive.

On January 30, 1987, two days after receiving notice of the legal action to enforce Klooster's judgment lien, the bank advanced $40,000 to the Kalkwarfs pursuant to a new $40,000 promissory note, secured by the July 31, 1986, real estate mortgage. The bank disbursed an additional $11,500 pursuant to a separate promissory note, also indicated to have been "advanced under" the July 31, 1986, real estate mortgage. Both notes were due in one year. The stated purpose of the $40,000 advance was "debts previously contracted." The stated purpose of the $11,500 advance was "1987 operating expenses." The total advance of $51,500 was applied to outstanding notes, resulting in an actual net cash disbursement of zero.

The January 30, 1987, $40,000 note is in default and forms the basis for this foreclosure action. Prior to foreclosure the bank never pressed the Kalkwarfs to pay any principal in connection with that note, despite a due date of January 30, 1988.

The Kalkwarfs paid the interest on the $40,000 note in 1988 and 1989. On the back of the note are two separate extension agreements. The first, executed by both Alberta and Loren Kalkwarf on June 17, 1988, served to extend the due date of the then overdue payment of the note. On February 1, 1989, Loren, but not Alberta, executed a second extension agreement which changed the interest rate of the note from 10.5% to eleven percent and extended the due date to February 2, 1990.

The bank brought this foreclosure action after the Kalkwarfs refused to pay the interest due on February 2, 1990. The bank expressly waived its right to a deficiency judgment against the Kalkwarfs. The Kalkwarfs chose not to respond to the foreclosure petition. Judgment has been rendered against them by default. Execution has been delayed until we determine the priority between the bank and Klooster. The trial court determined that the mortgage took priority for loans or advances made prior to January 28, 1987, and that the Klooster judgment took priority over loans or advances made thereafter. Issues are presented both on the bank's appeal and Klooster's cross-appeal.

Klooster claims priority on two grounds. He contends (1) the mortgage is fraudulent as to him, and (2) Iowa Code section 654.-12A grants him priority over the advancement of the $40,000 on January 30, 1987.

■ I. Mortgage foreclosure proceedings are equitable. Iowa Code § 654.1. This action was tried in equity; review is de novo. Iowa R.App.P. 4. Although we give weight to the fact-findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R.App.P. 14(f)(7); *Produc-*

The general economic conditions prevailing at the time these transactions occurred are relevant. In the 1980s, and particularly during the early part, farmland values had rapidly risen up to $4000 an acre and then plummeted to $1000. Many farmers became insolvent. As a result a number of banking institutions, particularly those who held farm mortgages, also became insolvent.

During the period of rising land values, banks, including [the bank], had been in the practice of loaning on the land equity. That's the difference in value between the market value and any encumbrance against the land.

Many banks considered a fifty percent equity loan to be conservative. That is, if land was considered to be worth $4000 an acre, it could conservatively sustain a $2000 an acre encumbrance. The problems developed when land plummeted to $1000 an acre and the farmers were unable to pay their mortgages. Attempts to foreclose resulted in numerous suits against banks for damages for allegedly failing to give proper fiduciary advice, failing to provide credit, and like claims.

At that time [the bank] went from farm equity lending to making long-term and short-term loans. The short-term loans were usually for one year and were not to exceed current assets and the value of growing crops. These debts were expected to be paid off at maturity.

The long-term loans also used notes that matured in one year as did most of the short-term loans. Except for the payment of interest, the bank did not expect the long-term notes to be repaid in one year. The long-term notes would be rewritten for another year. The bank's explanation for its use of one-year notes for long-term debts was that it wanted to be able to rewrite the long-term debt on an annual basis to reflect any changes in interest rates which were rapidly changing and to review the current situation of the debtor.

*tion Credit Ass'n v. Shirley,* 485 N.W.2d 469, 471 (Iowa 1992).

II. The trial court correctly rejected Klooster's claim of fraud. In *Shirley,* 485 N.W.2d at 472–73, we explained at length the principles controlling a creditor's claim of fraudulent preferential transfer. They were also discussed in *Rouse v. Rouse,* 174 N.W.2d 660, 667–69 (Iowa 1970). They can be summarized as follows:

■ 1. A debtor may lawfully prefer one creditor over another by way of sale, mortgage, or the giving of security to others even if the debtor's intentions toward the nonpreferred creditor are spiteful and will delay or prevent them from obtaining payment.

■ 2. A preferred creditor's knowledge that the debtor's purpose was fraudulent will not defeat his claim, so long as he acts in good faith for his own protection.

■ 3. Fraud on the part of the debtor will affect the rights of only those preferred creditors who in some way participate in it.

■ 4. When a preferred creditor knows of the debtor's fraudulent intent and accepts a mortgage of security wholly or in part to aid the fraud, that preferred creditor has participated in the wrong and the mortgage is fraudulent and will not be honored.

■ 5. Fraud must be found under the circumstances considered as a whole. Some indicia of fraud are: inadequacy of consideration; insolvency of the transferor; and pendency or threat of third-party creditor litigation.

■ 6. A valid preexisting debt is ordinarily sufficient consideration for any conveyance or giving of security, so long as the amount of the antecedent debt is not materially less than the value of the property conveyed or encumbered.

■ 7. A nonpreferred creditor bringing suit has the burden of showing the preferred creditor's intentional participation in the fraudulent preferential transfer by clear and satisfactory evidence.

■ We emphatically agree with the trial court's determination that the bank participated in no fraud, that it acted permissibly and prudently in

> trying to protect itself, even though it may have known there was a potential creditor that would be disadvantaged. The knowledge that there was a large unsecured judgment against Mr. Kalkwarf made it imperative that the bank act with dispatch. These matters only become litigated when a potential intervening creditor is involved.

III. Apart from the issue of fraud, this case comes down to a simple priority battle between the holder of a prior recorded mortgage and the holder of a subsequent judgment lien. The parties agree the dispute revolves upon Iowa Code section 654.-12A (priority of advances under mortgages).[3]

The parties agree that the mortgage was recorded prior to the filing of the judgment lien and also that the mortgage contains

---

**3.** Iowa Code § 654.12A provides, in pertinent part:

[I]f a prior recorded mortgage contains the notice prescribed in this section and identifies the maximum credit available to the borrower, then *loans and advances made under the mortgage, up to the maximum amount of credit together with interest thereon, are senior to indebtedness to other creditors under subsequently recorded mortgages and other subsequently recorded or filed liens* even though the holder of the prior recorded mortgage has actual notice of indebtedness under a ... subsequently recorded or filed lien. So long as credit is available to the borrower, payment of the outstanding mortgage balance to zero shall not extinguish the prior recorded mort-

gage if it contains the notice prescribed by this section. The notice prescribed by this section for the prior recorded mortgage is as follows:

NOTICE: This mortgage secures credit in the amount of _____. Loans and advances up to this amount, together with interest, are senior to indebtedness to other creditors under subsequently recorded or filed mortgages and liens.

*However, the priority of a prior recorded mortgage under this section does not apply to loans or advances made after receipt of notice of foreclosure or action to enforce a ... subsequently recorded or filed lien.*

(Emphasis added.)

the required notice; these statutory requirements are satisfied. The arguments focus on (1) whether the bank ever received "notice of foreclosure or action to enforce a ... subsequently recorded or filed lien"; and (2) whether the debt evidenced by the January 30, 1987, promissory note is a new loan or advance, rather than a mere continuation of the July 31, 1986, debt.

### A. *Notice*

■ Iowa Code section 654.12A generally provides loans and advances made under a prior recorded mortgage will have priority over subsequently recorded or filed liens. This is true even where the holder of the prior recorded mortgage has actual notice of indebtedness to other creditors under subsequently recorded or filed liens. This differs from the common-law rule under which actual notice of a subsequent encumbrance would defeat the priority of advancements under a prior recorded mortgage. *See National Bank of Waterloo v. Moeller*, 434 N.W.2d 887, 890 (Iowa 1989). Section 654.12A is self-limiting, however, in that the priority it grants "does not apply to loans or advances made after receipt of notice of foreclosure or action to enforce a ... subsequently recorded or filed lien."

■ We need not decide what types of notice are sufficient to trigger the limitation in section 654.12A because, contrary to the bank's argument, it had actual notice on January 28, 1987, of levy upon the Wright County land when Hinman observed the dictation to the sheriff which mentioned the levy. Thus under section 654.12A any loan or advance—under the mortgage—prior to January 28, 1987, is "senior to indebtedness to other creditors under ... subsequently recorded or filed liens." Any loan or advance—under the mortgage—after January 28, 1987, loses this priority.

The issue becomes whether the January 30, 1987, promissory note (the first note after actual notice), along with its subsequent extensions, constitute (1) a continuation of the July 31, 1986, loan; or (2) a new loan or advance under the mortgage.

### B. *1987 Promissory Note*

■ The January 30, 1987, promissory note was executed after the bank's January 28, 1987, receipt of actual notice. Thus, under Iowa Code section 654.12A, if the January 30, 1987, note is a "loan or advance made under the mortgage" it will be junior to the judgment lien.

We agree that the 1987 note and its extensions were for new indebtednesses. This question is to be resolved with a view to the limiting language in Iowa Code section 654.12A. We agree with the trial court that the purpose of the limiting language is "to prevent a mortgagee from manipulating its loans and advancements so as to shield mortgage property from other lienholders who are pursuing collection efforts against the property."

There are unmistakable indications of just such manipulations here, and the manipulations point to new short-term obligations, rather than to a continuing old one. The July 30, 1986, note purported to become due on July 31, 1987; the January 30, 1987, note purported to become due on January 30, 1988. The bank explained it used one-year notes for what it claimed to be a long-term obligation because it wanted to be able to review the changing situation of the debtor. This is not a hallmark of long-term debt. In reserving the right to make loan decisions on a regular basis, the bank has avoided the risks associated with the long-term financial commitment which accompanies long-term debt. After receiving actual notice of efforts to collect the Klooster judgment, the bank cannot claim priority for its subsequent transactions with the borrower merely by stamping them with its former priority status. The trial court was correct in so ruling.

Contrary to the bank's contention, the case of *Van Dusseldorp v. State Bank of Bussey*, 395 N.W.2d 868 (Iowa 1986), is not controlling. We do not suggest that a lender must foreclose forthwith or else lose its priority status for prior indebtedness. We do not hold that a prior indebtedness, with proper documentation, can never be modified and kept alive so as to continue to enjoy a priority status. We only hold, with

the trial court, that indebtedness evidenced by, and advances made on the basis of, the $40,000 note issued on January 30, 1987, were subject to the Klooster judgment.

What we have said makes other contentions moot.

AFFIRMED ON BOTH APPEALS.