Morris C. BENSON, James C. Carr, Garry Cole, Rodney Johnson, Paul Royer, Peter F. Kepros, George W. Wexler, and Richard K. Reams, Appellees/Cross–Appellants,

v.

Phyllis RICHARDSON, Appellant/Cross–Appellee,

and

Richardson Professional Corporation, Cross–Appellee,

and

Gary Richardson, Defendant.

No. 94–87.

Supreme Court of Iowa.

Sept. 20, 1995.

Arthur F. Owens and James W. O'Brien of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellant and cross-appellees.

David W. Dunn of Dunn & Dunn, Eldora, and Diane Stahle of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, for appellees.

Considered by HARRIS, P.J., and LARSON, CARTER, LAVORATO, and SNELL, JJ.

SNELL, Justice.

This case comes to us with numerous questions involving transactions allegedly created to avoid payments to judgment creditors. The district court found many instances of fraud and entered judgment against Phyllis Richardson, the debtor's wife, for $577,938. On appeal by the Richardson defendants, we affirm with modification and remand for entry of judgments. On cross-appeal by the plaintiffs, we reverse and remand for entry of judgment.

I. Factual Background

A. Federal Litigation

In early 1986, the plaintiffs, Drs. Morris Benson, James C. Carr, Garry Cole, Rodney Johnson, Paul Royer, George Wexler, Richard Reams, Peter Kepros, and other parties brought an action in the United States District Court for the Northern District of Iowa asserting claims against Dr. Gary Richardson, a surgeon, his wife, Phyllis Richardson, and other defendants. This litigation involved claims arising from certain investments, including a limited partnership in which Gary was a general partner.

In May of 1987, the Richardsons filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Iowa. In June of 1987, the plaintiffs filed an adversary proceeding in the bankruptcy action arguing the claims they asserted against the Richardsons in the federal action were nondischargeable. On June 16, 1988, the plaintiffs amended their complaint to state solely a cause of action against Gary. The adversary proceeding was subsequently consolidated with the federal litigation for purposes of trial and proceeded to trial in 1989.

On July 16, 1990, the United States District Court for the Northern District of Iowa entered an order which, as amended on October 5, 1990, awarded a judgment against Gary in favor of the plaintiffs for an amount in excess of $1,000,000 including punitive

damages. The federal court did not enter judgment against Phyllis Richardson. The court held the plaintiffs' claims against Gary were not dischargeable in bankruptcy.

Following the date of the federal district court judgment, the Richardsons engaged in certain transactions which are the subject of the appeal before us. Three groups of transactions are at issue: (1) bank account transactions; (2) real estate payments and transactions; and (3) the creation and operation of a professional corporation, Richardson, P.C.

### B. Bank Account Transactions

Prior to the date of the final judgment in the federal litigation, the Richardsons held a joint checking account at First Security Bank and Trust in Charles City, Iowa. On January 9, 1990, Gary deposited $40,000 of his year-end bonus into the First Security Bank joint account. On July 19, 1990, three days after the federal district court entered its judgment in favor of the plaintiffs, Phyllis withdrew the entire balance in the First Security Bank joint account and deposited it, along with $18,453.43 of Gary's current earnings, into her personal checking account. Throughout 1990 and early 1991, Gary did not maintain any bank account of his own and continued to deposit his earnings into Phyllis' personal account, over which he had no signature authority.

### C. Real Estate Payments and Transactions

In the late 1970s, the Richardsons purchased a home located on a forty acre parcel of land outside of Charles City, Iowa. When they filed their bankruptcy petition, this residence was their homestead, and was titled in both their names. After they filed for bankruptcy in 1987, the owner of the mortgage on this property foreclosed on it, and the Richardsons retained no equity.

In December of 1987, the Richardsons purchased a home located at 401 North Jackson in Charles City. They purchased this home for $75,000 and borrowed $60,000 from First Security Bank which took a mortgage on the property as collateral. This home remained the Richardsons' principal residence until they sold it in October of 1989. When they sold it, the Richardsons had equity of $23,827.

In October of 1989, the Richardsons used the equity of $23,827 to pay a portion of a $36,000 down payment they made on their next home, located at 205 Blunt Street in Charles City. The remaining portion of the cash down payment came from Gary's earnings, and the Richardsons borrowed $144,000 from First Security Bank to pay the remainder of the purchase price of $180,000. The Richardsons titled the 205 Blunt Street home solely in the name of Phyllis.

In January of 1990, Gary used his 1989 year-end bonus from a professional corporation in which he was a shareholder, Associates in Surgery, P.C., to pay $50,000 on the $144,000 mortgage loan. This payment reduced the loan balance to $93,737.80 and reduced the monthly payment from $1,467 to $953. In August of 1990, in order to complete the process of eliminating the remaining mortgage balance, Gary unilaterally granted First Security Bank a security interest in his 1990 year-end bonus and filed a financing statement with the Secretary of State. First Security Bank had not requested any additional collateral or further reduction of the principal amount of the mortgage.

When the security agreement and financing statement were brought to the attention of the president of First Security Bank during a routine review of recently filed financing statements, the president sent a letter to the Richardsons indicating he was puzzled by Gary's unilateral action. Gary's attorney, Arthur Owens, responded by sending a letter to the bank president in which he mentioned the recent non-dischargeable judgment rendered against Gary and stated Gary wished to improve the position of the bank as his mortgage lender. In addition to entering into a new security agreement with the bank, Gary also entered into a security agreement with the law firm which represented him, Dickinson, Throckmorton, Parker, Mannheimer & Raife, in the event the payoff of the mortgage loan did not completely exhaust his year-end bonus.

At the end of 1990, Gary received a substantial bonus which allowed him to make a

$94,000 payment to completely pay off the mortgage on the 205 Blunt Street home. The payoff was made directly to the bank from Associates in Surgery. After the payoff, Phyllis owned the house free and clear of any liens.

In July of 1992, the Richardsons moved to Newton, Iowa, and Phyllis purchased another home in her name at 1004 South Fifth Avenue West in Newton. At the present time, the Newton house constitutes the Richardsons' homestead. To purchase this home at a price of $167,253, the Richardsons borrowed $100,000 and made a down payment of $7000, leaving approximately $60,000 due at closing. On January 22, 1992, the Richardson's corporation, Richardson, P.C., distributed $650 in dividends to Gary and $64,350 in dividends to Phyllis. Phyllis used this money to pay the remaining cash due on the mortgage. In total, during the time period from January 8, 1990 through the purchase of the Newton property, Phyllis acquired real estate equity of approximately $211,000, all originating from Gary's income.

### D. Formation and Operation of Richardson, P.C.

Gary began his association with Associates in Surgery, P.C. in 1976 or 1977 when he became an employee of the professional corporation. In 1977, he became a shareholder. As a result of the bankruptcy proceeding, Gary surrendered his shares in May of 1987 and became an employee. He maintained this status until January 3, 1991. In the late 1980s, Gary also entered into agreements with the Floyd County Hospital and St. Joseph's Hospital to perform part-time services. Phyllis was trained as a nurse but did not work outside the home from 1976 until 1988. In 1988, she began part-time work and her 1988 and 1989 earnings were $1514 and $533 respectively.

A few months after the entry of the federal judgment against Gary, in late 1990, Gary and Phyllis formed a professional corporation, Richardson, P.C. Richardson, P.C. issued 100 shares of stock: one share to Gary in exchange for a $200 promissory note, and ninety-nine shares to Phyllis in exchange for a $19,800 promissory note. Richardson, P.C. has not made demand on either of the notes.

Gary entered into an employment agreement with Richardson, P.C. providing that he would receive an annual salary from the corporation of $49,900. He later amended the employment agreement to provide he would receive no salary for the first quarter of 1991 and would thereafter receive a monthly salary of $4150. Gary then substituted Richardson, P.C. for himself in the employment agreements he had previously entered into with Associates in Surgery, P.C., Floyd County Hospital, and St. Joseph's Hospital.

The agreement between Associates in Surgery, P.C. and Richardson, P.C. provided Richardson, P.C. would receive sixty-six and two-thirds percent of the adjusted gross income of Associates in Surgery during the term of the agreement. The reason Gary received no salary from Richardson, P.C. for the first quarter of 1991 was because the agreement between Associates and Richardson, P.C. provided Richardson, P.C. would receive a percentage of income generated from services Gary performed after January 1, 1991, creating a period of lag time.

Pursuant to the operation of Richardson, P.C., Gary received one percent of the amount by which his earnings exceeded his Richardson, P.C. monthly salary, and Phyllis received ninety-nine percent. Gary's earnings as a physician and surgeon in the two years prior to the formation of Richardson, P.C. were $425,983 and $428,201 respectively. During 1991, the first year of operation of Richardson, P.C., Gary's earnings were $41,648. Phyllis also became an employee of Richardson, P.C. Gary's earnings account for at least 95% of Richardson, P.C.'s gross revenue.

### E. State District Court Action

On September 11, 1991, the plaintiffs brought an action in the Iowa District Court for Floyd County against Gary, Phyllis, and Richardson, P.C. asserting the bank account transfers, house payments, and establishment and operation of Richardson, P.C. constituted fraudulent transfers to Phyllis which were calculated to avoid payment of the federal litigation judgment. The district court

held the challenged transfers were fraudulent, awarded judgment against Phyllis in the amount of $577,938 exclusive of interest, and imposed a constructive trust in favor of the plaintiffs on the 205 Blunt Street property located in Charles City, Iowa.

The plaintiffs filed an Iowa Rule of Civil Procedure 179(b) motion to amend requesting the district court to enlarge its ruling to include judgment against Richardson, P.C. The motion was denied. The Richardsons filed a post-judgment motion alternatively seeking a new trial or a reopening of the record to admit evidence they had made post-trial payments to the Internal Revenue Service. The district court denied the motions of all parties. The Richardsons have appealed the district court's judgment and denial of their alternative motions, and the plaintiffs have appealed the district court's denial of their rule 179(b) motion.

## II. Standard of Review

The plaintiffs brought this equitable action pursuant to Iowa Code section 630.16 (1991). We review a trial court judgment rendered in a section 630.16 action de novo. *Central Fibre Prods. Co. v. Lorenz,* 246 Iowa 384, 388, 66 N.W.2d 30, 33 (1954); *Tri–State Ref. & Inv. Co. v. Opdahl,* 481 N.W.2d 710, 712 (Iowa App.1991). The trial court's findings do not bind us but we give them considerable weight. *Central Fibre,* 246 Iowa at 388, 66 N.W.2d at 33; *Tri–State,* 481 N.W.2d at 712.

## III. Analysis

### A. Applicable Legal Principles

A fraudulent conveyance is a "transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his creditors, or which operates to the prejudice of their legal or equitable rights." *Production Credit Ass'n v. Shirley,* 485 N.W.2d 469, 472 (Iowa 1992) (quoting *Graham v. Henry,* 456 N.W.2d 364, 366 (Iowa 1990)); *Generic Farms v. Stensland,* 518 N.W.2d 800, 802 (Iowa App.1994). The doctrine of fraudulent conveyances advances the principle that a debtor's property constitutes a fund from

which the debtor's obligations should be paid and the debtor may not frustrate a creditor's right to obtain satisfaction from the fund. *Graham,* 456 N.W.2d at 366. When a debtor disposes of property with the intent to delay or defraud creditors, we deem the disposition inequitable and will set it aside. *Id.*

In Iowa, a party asserting fraud must establish its existence by clear and convincing evidence and demonstrate the fraud has caused him or her prejudice. *Production Credit Ass'n,* 485 N.W.2d at 472; *Graham,* 456 N.W.2d at 366; *Generic Farms,* 518 N.W.2d at 803. When determining whether a transaction constitutes a fraudulent conveyance, we look for a number of badges or indicia of fraud: inadequacy of consideration, insolvency of the transferor, pendency or threat of third-party creditor litigation, secrecy or concealment, departure from the usual method of business, any reservation of benefit to the transferor, and the retention by the debtor of possession of the property. *Production Credit Ass'n,* 485 N.W.2d at 472; *Graham,* 456 N.W.2d at 366; *Generic Farms,* 518 N.W.2d at 802–03; *Muehlenthaler v. DeBartolo,* 347 N.W.2d 688, 690 (Iowa App.1984). The existence of a "blood relationship" is not a per se indication of fraud, but its existence strengthens the inference of a fraudulent conveyance and we will apply close scrutiny to such a transaction. *Production Credit Ass'n,* 485 N.W.2d at 472; *Graham,* 456 N.W.2d at 366; *Price v. Scharpff,* 220 Iowa 125, 128, 261 N.W. 511, 512 (1935); *Muehlenthaler,* 347 N.W.2d at 690; *see also First Nat'l Bank v. Frescoln Farms, Ltd.,* 430 N.W.2d 432, 435–36 (Iowa 1988) (transactions between a parent and child will be closely scrutinized). When analyzing a transfer between relatives, we look for strict proof of the existence of consideration and the fairness of the transaction. *Graham,* 456 N.W.2d at 366.

We presume a transfer of property without consideration is fraudulent. *Frescoln Farms,* 430 N.W.2d at 435; *Regal Ins. v. Summit Guar. Corp.,* 324 N.W.2d 697, 703 (Iowa 1982). In order to rebut this presumption of constructive fraud, the transferee must prove the transferor remained solvent after the transfer. *Frescoln Farms,* 430

N.W.2d at 435; *Regal Ins.,* 324 N.W.2d at 703. The law does not require parties challenging a transaction as constructively fraudulent to establish actual dishonesty or intent. *Frescoln Farms,* 430 N.W.2d at 435; *Regal Ins.,* 324 N.W.2d at 703.

■■■■ Under Iowa law, an individual debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at fair valuation." *Frescoln Farms,* 430 N.W.2d at 436 (quoting Uniform Fraudulent Transfer Act § 2(a) (1984)). Under this formulation, property exempt under nonbankruptcy law is not considered a part of the debtor's assets. *Frescoln Farms,* 430 N.W.2d at 436–37.

■■■■ Two instances exist where courts will not invalidate conveyances which appear to be fraudulent. First, a debtor may prefer one creditor over another by way of sale, mortgage, or the giving of security to others even if the debtor's intentions toward the nonpreferred creditor are spiteful and the action will delay or prevent the nonpreferred creditor from obtaining payment. *First State Bank v. Kalkwarf,* 495 N.W.2d 708, 712 (Iowa 1993); *Production Credit Ass'n,* 485 N.W.2d at 472. Second, debtors have a legal right to convey exempt property regardless of their motive. *Claeys v. Koeppel,* 193 N.W.2d 525, 528 (Iowa 1972); *Hall Roberts' Son, Inc. v. Plaht,* 253 Iowa 862, 865, 114 N.W.2d 548, 549 (1962); *Burk v. Putman,* 113 Iowa 232, 235, 84 N.W. 1053, 1054 (1901); 37 Am.Jur.2d *Fraudulent Conveyances* § 103, at 785–86 (1968).

■■■■ Creditors cannot claim property that would have been exempt had it remained in the hands of the debtor, nor can they claim property held in a wife's name acquired by the husband's exempt earnings while the earnings were exempt. *Burk,* 113 Iowa at 235, 84 N.W. at 1054. Where a conveyance includes both exempt and non-exempt property, creditors of the transferor may reach the non-exempt property if the conveyance is fraudulent to them. *Hall Roberts' Son,* 253 Iowa at 865, 114 N.W.2d at 549. Exempt funds lose their exempt status if their form is changed by investment in other property. *Midamerica Sav. Bank v.*

*Miehe,* 438 N.W.2d 837, 838 (Iowa 1989); *Iowa Methodist Hosp. v. Long,* 234 Iowa 843, 852, 12 N.W.2d 171, 175 (1944). Personal earnings which are exempt from garnishment under Iowa Code section 642.21 (1995) and which can be traced to a checking account or savings account in a financial institution, continue to be exempt from creditors' levies if the deposits can be traced from wages the debtor received within ninety days preceding the levy. *Midamerica,* 438 N.W.2d at 839–40. Iowa law, therefore, provides greater protection to debtors than a number of other jurisdictions which hold that earnings lose their exempt status the instant they are deposited with a financial institution. *See, e.g., Dunlop v. First Nat'l Bank,* 399 F.Supp. 855 (D.Ariz.1975); *Ferre v. City Nat'l Bank,* 548 So.2d 701, 704 (Fla.Dist.Ct.App.1989); *Society Nat'l Bank v. Tallman,* 19 Ohio App.3d 127, 483 N.E.2d 170, 171–72 (1984); *Household Fin. Corp. v. Kinder,* 3 Ohio Misc.2d 3, 444 N.E.2d 99, 100 (Akron, Ohio Mun.Ct. 1982).

### B. Bank Account Transactions

■■■■ The Richardsons assert that the Federal Consumer Credit Protection Act, 15 U.S.C. sections 1671–77, applies to this case, and pursuant to its provisions, the trial court erred in holding all of Gary's earnings transferred to Phyllis' bank account were subject to the plaintiffs' levy. The Richardsons contend the federal act preempts Iowa exemption law and pursuant to the federal law, 75% of Gary's earnings, as transferred to Phyllis, were not subject to satisfaction of the plaintiffs' judgment.

■■■■ The Consumer Credit Protection Act does not preempt Iowa garnishment law, but instead works in tandem with state law and provides a debtor with certain minimum protections against garnishment. *Koethe v. Johnson,* 328 N.W.2d 293, 296 (Iowa 1982). Iowa garnishment law adopts by reference some provisions of the Federal Consumer Protection Act, but also grants additional protections to wage earners not granted by the federal act. *Midamerica,* 438 N.W.2d at 838. The federal act yields to state laws, such as Iowa's, when they provide greater

restrictions on garnishment. *Koethe,* 328 N.W.2d at 296.

In *Midamerica,* we noted resolution of the issue of what wages are exempt and under what circumstances wages lose their exemption requires the interpretation of state law rather than federal law. *Midamerica,* 438 N.W.2d at 838. Because neither federal nor Iowa statutes deal directly with the issue of when assets lose their exempt status, we must look to our prior decisions for guidance. *Id.*

■ As the trial court correctly noted, clear and convincing evidence demonstrates that immediately after the plaintiffs received a favorable non-dischargeability judgment, the Richardsons took steps to place Gary's earnings beyond the plaintiffs' reach. At the time of the non-dischargeability judgment, the Richardsons owned a joint account. All of the funds in the joint account were attributable to Gary's earnings. Three days after entrance of the judgment, Phyllis withdrew over $36,000 from the joint account and deposited these funds and over $18,000 of Gary's current earnings into her own personal account. Since that time, Gary has placed his earnings in Phyllis' personal account and has not maintained an account of his own.

In the absence of any protections created by statutory exemptions, Gary's placement of his earnings in Phyllis' personal account constituted, by clear and convincing evidence, a fraudulent conveyance. All transfers in question occurred without consideration, and the Richardsons have failed to rebut the corresponding presumption of fraud by demonstrating Gary was in fact solvent within the definition of *Frescoln Farms,* 430 N.W.2d at 436–37. Gary has in fact admitted he was insolvent. We hold that the trial court did not err in finding the bank account transactions constructively fraudulent.

■ The trial court was also correct in finding the transactions amounted to intentional fraudulent conveyances. Applying close scrutiny to the transactions, we find the existence of several badges or indicia of fraud: (1) the placement of Gary's funds in Phyllis' personal account constituted a departure from the Richardsons' usual method of

managing their finances; (2) following the change in the Richardsons' management of their finances, Gary maintained the full benefit of his earnings he previously enjoyed, with little or no additional inconvenience; and (3) Gary effectively retained full access to and possession of his earnings because Phyllis provided him with signed checks at his request.

■ The challenged bank transactions occurred between July 23, 1990 and January 3, 1991. Because Gary's earnings for 1990, the subject of these deposits, were far in excess of $50,000, Iowa Code section 642.21(1)(e) applied. Assuming Gary had placed these earnings in his own account, 10% of these earnings would have been subject to garnishment if they were traceable to wages he received within ninety days preceding the plaintiffs' action. *Midamerica,* 438 N.W.2d at 839–40. The last of the deposits in question occurred on January 3, 1991, and consisted entirely of 1990 wages. The plaintiffs did not bring their action challenging these transactions until September 11, 1991. Therefore, if Gary had placed these funds in his own bank account and they had remained in that account, the exempt status of any remaining earnings would have expired prior to the plaintiffs' action. Gary's placement of his earnings into Phyllis' account therefore prejudiced the plaintiffs because funds which would have ceased being exempt were placed beyond the plaintiffs' reach for satisfaction of their judgment.

The Richardsons rely on an old Iowa case, *Ehlers v. Blumer,* 129 Iowa 168, 170, 105 N.W. 406, 406 (1905), for the proposition that a husband's transfer of his exempt wages to his wife cannot constitute a fraud upon the husband's creditors. *Ehlers* is distinguishable from the case at hand because it was the longstanding practice of the husband and wife in *Ehlers* to have the husband transfer his earnings to the wife to pay family expenses. In considering exemption legislation enacted subsequent to our *Ehlers* decision, we have held exempt earnings placed by a debtor in his or her own account only maintain their exempt status for ninety days following their receipt. If we were to give *Ehlers* the interpretation the Richardsons

urge upon us, this would create a loophole which would inspire parties to engage in technical changes of form which would leave substance unchanged. The Richardsons would have us hold that where an individual places exempt earnings in their own bank account, the earnings lose their exempt character ninety days after their receipt, but if the individual places the earnings in another person's account but maintains full enjoyment of those earnings, those earnings are entirely exempt from the reach of creditors. We will not sanction the existence of such a loophole.

We hold when an individual places exempt earnings in the bank account of another, but retains full enjoyment of those earnings as if he or she held the earnings in his or her own account, those earnings only retain their exempt character for ninety days following their receipt. This rule would not apply to situations such as that in *Ehlers,* where it is shown the parties had a longstanding practice of managing their finances in this manner prior to the entrance of the judgment. In the case at bar, however, where clear and convincing evidence has been presented to show a marked departure from the couple's previous practices, along with the parties' underlying intent to defraud the husband's creditors, we draw a different conclusion. We hold this type of scheme constitutes a change in form of the earnings sufficient to cause them to lose their exempt character entirely. *See Iowa Methodist Hosp.,* 234 Iowa at 852, 12 N.W.2d at 175; *Ferre,* 548 So.2d at 703–04.

In this case we have found that although Gary transferred his earnings to his wife, he retained full enjoyment of those funds, as if he had maintained them in his own account. We have also found clear and convincing evidence demonstrates the Richardsons engaged in these transactions in order to place the funds beyond the reach of the plaintiffs. The legislative purpose behind restrictive garnishment provisions was to protect individuals from predatory extensions of credit which have resulted in excessive credit burdens, disruption of consumer employment, production, and consumption, and have led to excessive bankruptcy filings.

*Koethe,* 328 N.W.2d at 296 n. 2. Individuals may not utilize these provisions to devise schemes to fraudulently shield their earnings from judgment creditors. We affirm the trial court's award of the entire sum of the challenged bank transactions to the plaintiffs.

## C. House Transactions

In October of 1989, the Richardsons purchased the 205 Blunt Street home by making a $36,000 cash down payment and borrowing $144,000 from First Security Bank. Although the 205 Blunt Street home was titled solely in Phyllis' name, Gary signed the First Security Bank mortgage loan. In January of 1990, Gary used his 1989 year-end bonus to pay $50,000 on the $144,000 mortgage loan. This payment reduced the loan balance to $93,737.80 and reduced the monthly payment from $1467 to $953. In August of 1990, Gary unilaterally granted First Security Bank a security interest in his 1990 year-end bonus and ultimately used that bonus to make a $94,000 payment to pay off the mortgage in its entirety. As a result of the two payoffs, Phyllis obtained equity in the home of $144,000.

The plaintiffs challenge the $50,000 and $94,000 payments on the ground that they constituted fraudulent conveyances from Gary to Phyllis. The Richardsons argue that the trial court erred in finding the two payments to be fraudulent conveyances for two reasons: (1) the payments merely represented an allowable preferential payment to a creditor by Gary; and (2) Gary made the payments with substantially exempt earnings. The trial court held that the payments constituted a fraudulent conveyance of property from Gary to Phyllis because Phyllis obtained $144,000 in equity and Gary received no consideration in return.

The trial court relied on a Maryland Court of Special Appeals case, *Pearce v. Micka,* 62 Md.App. 265, 489 A.2d 48, 53 (1985), for the proposition that where an insolvent debtor husband uses earnings to pay off a mortgage for the benefit of his wife, to the extent that the payments increase the wife's equity in the property, a transfer of property from one spouse to another made or granted

in prejudice of the rights of creditors has occurred. Although the court in *Pearce* was interpreting Maryland statutory law modeled after the Uniform Fraudulent Conveyance Act, the court's rationale is equally applicable to the case before us. Under Iowa law a debtor may prefer one creditor over another even if the debtor's intentions toward the nonpreferred creditor are spiteful and the action will delay or prevent the nonpreferred creditor from obtaining payment. *First State Bank v. Kalkwarf*, 495 N.W.2d at 712; *Production Credit Ass'n*, 485 N.W.2d at 472. A debtor husband may not, however, at the same time accomplish a transfer without consideration to his wife to the frustration of his creditors. *Pearce*, 489 A.2d at 53. As the court in *Cashion v. Western Telegraph Co.*, 123 N.C. 267, 273, 31 S.E. 493 (1898) stated, "generosity is not a virtue when dealing with the property of others." The preference of a creditor may not be used as a subterfuge for disguising a property transfer to a spouse without consideration. What the Richardsons accomplished was not the preference of a creditor, but was a fraudulent conveyance of property from Gary to Phyllis.

■ At the same time, creditors may not reach property held in a wife's name which was acquired by the husband's exempt earnings while the earnings were exempt. *Burk*, 113 Iowa at 235, 84 N.W. at 1054. Pursuant to Iowa Code section 642.21, because Gary earned $425,983 in 1989 and $428,201 in 1990, 10% of these earnings were not exempt from the creditors' levies. The plaintiffs are entitled to $42,598.30 and $42,820.10 for each year respectively. Therefore, we modify the trial court's award of the full $144,000 to an award of $85,418.40.

■ The trial court imposed a constructive trust on the 205 Blunt Street property in favor of the plaintiffs to satisfy the court's $144,000 judgment against Phyllis. The trial court ordered a judgment lien in the amount of $144,000 should attach to the property and the plaintiffs could execute and levy upon the property and sell it. The Richardsons challenge this remedy on the ground the mortgage payments were not fraudulent because they constituted a preferential payment to a creditor, the payments were made with substantially exempt funds, and the 205 Blunt Street property was Phyllis' homestead at the time of the payoff.

■ A constructive trust is an equitable remedy courts apply to provide restitution and prevent unjust enrichment. *Regal Ins. Co. v. Summit Guar. Corp.*, 324 N.W.2d 697, 704 (Iowa 1982). A constructive trust is a remedial device under which the holder of legal title to property is held to be a trustee for the benefit of another who in good conscience is entitled to the beneficial interest. *Id.* at 704–05 (quoting *Loschen v. Clark*, 256 Iowa 413, 419, 127 N.W.2d 600, 603 (1964)). Three types of constructive trusts exist: (1) those arising from actual fraud; (2) those arising from constructive fraud; and (3) those based on equitable principles other than fraud. *Regal Ins.*, 324 N.W.2d at 705. The law requires the party seeking the remedy of constructive fraud to establish the right by clear, convincing, and satisfactory evidence. *Id.*

The plaintiffs have established a right to the remedy of constructive trust by clear, convincing, and satisfactory evidence. As we have discussed above, the record clearly demonstrates Gary's intent to fraudulently place his earnings beyond the reach of the plaintiffs. In addition, that portion of Gary's earnings which were not exempt from levy can be easily traced to Phyllis' equity interest in the 205 Blunt Street property.

■ A party in whose favor a constructive trust has been established may trace the property to where it is held and reach whatever has been obtained through the use of it. *Cox v. Waudby*, 433 N.W.2d 716, 718 (Iowa 1988). This is true for all property, including property constituting an individual's homestead. *Id.* at 718–19. We noted in *Cox*, "the legislature never contemplated nor intended that a homestead interest could be created or maintained with wrongfully appropriated property." *Id.* at 719. Analogous to this proposition, we hold a homestead may not be created or maintained with non-exempt earnings fraudulently kept from the reach of creditors. We therefore affirm the trial court's imposition of a constructive trust on the 205 Blunt Street prop-

erty in favor of the plaintiffs, but reduce the amount of the trust from $144,000 to $85,418.40 to reflect the extent of non-exempt funds.

### D. Richardson, P.C.

Shortly after the entrance of the federal judgment against Gary, the Richardsons set up Richardson, P.C. Richardson, P.C. issued one share of stock to Gary and ninety-nine shares to Phyllis. Gary then entered into an employment agreement with Richardson, P.C. which provided that he would ultimately receive a monthly salary of $4150. Gary then substituted Richardson, P.C. for himself in the employment agreements he had entered into with Associates in Surgery, Floyd County Hospital, and St. Joseph's Hospital. Under this scheme, the excess of Gary's earnings as a surgeon would then flow to Phyllis in the form of dividends paid on her 99% ownership of Richardson, P.C.

The trial court entered a judgment against Phyllis for $267,300 in dividends Richardson, P.C. paid to her from July of 1991 through August of 1992. The court held the dividends actually constituted a fraudulent conveyance of property by Gary to Phyllis. The court, however, refused to enter a judgment against Richardson, P.C. in favor of the plaintiffs even though it held the formation of the corporation was fraudulent.

The legal treatment of a corporation as an entity entirely separate from its stockholders serves the goals of convenience and justice. *Kline v. Kline,* 104 Mich.App. 700, 305 N.W.2d 297, 298–99 (1981). When the corporate form is invoked to subvert the ends of justice, it should be and is disregarded by the courts. *Id.* 305 N.W.2d at 299. Where a corporation is merely an instrumentality or device set up to ensure the avoidance of the legal obligations of shareholders, courts may ignore the corporate form. *Id.* A court may look through the corporate veil to avoid fraud or injustice. *Id.*

As the Michigan Court of Appeals has noted:

When the notion of a corporation as a legal entity is used to defeat public convenience, justify a wrong, protect fraud or defend crime, that notion must be set aside and the corporation treated as the individuals who own it.

*Id.* We will set aside the corporate fiction if there is such unity of interest and ownership that the individuality of the corporation and its owners have ceased and the facts demonstrate observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice. *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 917, 591 P.2d 1078, 1084 (1979). Though typically employed to reach the assets of corporate owners to satisfy corporate liability, the alter ego doctrine is also a tool by which courts may satisfy the liabilities of individual owners with corporate assets. *Central Nat'l Bank & Trust Co. v. Wagener,* 183 N.W.2d 678, 682 (Iowa 1971); *Central Fibre,* 246 Iowa at 389, 66 N.W.2d at 33; *Minich,* 99 Idaho at 917, 591 P.2d at 1084.

The record contains clear and convincing evidence to demonstrate the Richardsons established Richardson, P.C. in order to fraudulently shield Gary's earnings from his creditors and to allow Gary to accumulate assets beyond the reach of the creditors. The plaintiffs' accounting expert testified the value of Richardson, P.C. was approximately 3.3 million dollars at the time of trial. Gary essentially transferred this value to the corporation in return for an annual salary of approximately $50,000 and a 1% ownership interest.

The Richardsons assert an Iowa case, *Shircliffe v. Casebeer,* 122 Iowa 618, 98 N.W. 486 (1904), sanctions the operation of Richardson, P.C. for the purpose of shielding Gary's earnings from his creditors. While it is true a husband may validly work for a bona fide corporation owned by his wife as occurred in *Shircliffe,* and the corporate assets will remain beyond the reach of the husband's creditors, we noted in *Shircliffe* where a wife

holds title to property as a mere trustee for the use of the husband, or as mere device by which property secretly owned by the husband may be placed beyond the reach of process at the suit of his creditors,

equity will decree its subjection to their claims.

*Id.,* 122 Iowa at 621, 98 N.W. at 487. In *Shircliffe,* we noted the record clearly demonstrated the wife was always considered the owner of the business in question and the wife invested money of her own in the start-up of the corporation. *Id.*

In the case before us, the Richardsons provided us with no credible purpose for the establishment of Richardson, P.C. other than to maintain the Richardsons' lavish lifestyle and shield Gary's substantial earnings from satisfaction of his obligations. Richardson, P.C. is truly Gary's alter ego. It stands in his place with regard to his former employment arrangements and serves no independent purpose other than to provide for the day-to-day comfort of himself and his family. Fraudulent concealment of earnings is not a valid purpose for a corporation. We therefore hold the trial court erred in denying the plaintiffs' 179(b) motion, and we direct entry of judgment against Richardson, P.C. for the full amount of the federal district court judgment rendered against Gary.

Where equity requires us to examine the purposes of a corporation, we are not bound by forms, fiction, or technical rules, but will seek to determine the true situation. *Central Fibre,* 246 Iowa at 389, 66 N.W.2d at 33. Clear and convincing evidence demonstrates the $267,000 in dividends merely constitute a fraudulent conveyance by Gary of his earnings to Phyllis as part of the couple's attempt to shelter funds from the plaintiffs. Gary's transfer of his earnings to Richardson, P.C. and the corporation's subsequent payment of those funds to Phyllis, all in furtherance of a fraudulent scheme, constituted a change in form of Gary's earnings sufficient to cause them to entirely lose any exempt character they once had. *See Midamerica Sav. Bank v. Miehe,* 438 N.W.2d 837, 838 (Iowa 1989); *Iowa Methodist Hosp. v. Long,* 234 Iowa 843, 852, 12 N.W.2d 171, 175 (1944). The purposes of the garnishment exemption statutes would by no means be furthered by rewarding individuals for engaging in such schemes. We therefore affirm the district court's judgment against

Phyllis for the $267,000 in Richardson, P.C. dividends.

## IV. Motion for New Trial

The Richardsons filed a post-judgment motion pursuant to Iowa Rule of Civil Procedure 244(g) which requested the court grant them a new trial or alternatively to reopen the record to admit additional evidence and modify its decision in light of post-trial payments by the Richardsons to the IRS. The trial court denied the Richardsons' motion on the ground rule 244(g) only applies to evidence which existed at the time of trial but could not with reasonable diligence be discovered and produced at trial.

Trial courts have broad but not unlimited discretion in ruling on motions for new trials. *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch,* 497 N.W.2d 821, 828 (Iowa 1993); *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 13 (Iowa 1990). We do not favor motions for new trial based on newly discovered evidence. *In re D.W.,* 385 N.W.2d 570, 583 (Iowa 1986). We will not disturb the trial court's ruling unless the evidence clearly shows the court has abused its discretion. *Iowa–Illinois Gas,* 497 N.W.2d at 828; *Kiner,* 463 N.W.2d at 13. We will only find an abuse of discretion if the trial court clearly exercised its discretion on untenable grounds or acted unreasonably. *Kiner,* 463 N.W.2d at 13.

Iowa Rule of Civil Procedure 244(g) allows a party to seek a new trial on the ground material evidence was discovered which could not with reasonable diligence have been discovered and produced at trial. A party seeking a new trial on such grounds must demonstrate three things: (1) the evidence is newly discovered and could not, in the exercise of due diligence, have been discovered prior to the conclusion of the trial; (2) the evidence is material and not merely cumulative or impeaching; and (3) the evidence will probably change the result if a new trial is granted. *In re D.W.,* 385 N.W.2d at 583. Under Iowa law, "newly discovered evidence" sufficient to merit a new trial is evidence which existed at the time of trial, but which, for excusable reasons, the party was unable to produce at the

time. *Embassy Tower Care, Inc. v. Tweedy,* 516 N.W.2d 831, 833 (Iowa 1994); *In re D.W.,* 385 N.W.2d at 583; *Mulkins v. Board of Supervisors,* 330 N.W.2d 258, 261 (Iowa 1983); *Wilkes v. Iowa State Highway Comm'n,* 186 N.W.2d 604, 607 (Iowa 1971); 58 Am.Jur.2d *New Trial* § 423, at 398 (1989). We recognize an exception to this rule in extraordinary cases in which an "utter failure of justice will unequivocally result" if the new evidence is not considered or where it is no longer just or equitable to enforce the prior judgment. *Wilkes,* 186 N.W.2d at 607 (quoting 66 C.J.S. *New Trial* § 101, at 294 (1950)); *accord Mulkins,* 330 N.W.2d at 262; *see also In re D.W.,* 385 N.W.2d at 583.

The Richardsons have failed to convince us this case is an extraordinary case in which we should reverse the trial court's denial of a motion for new trial on the basis of acts or events which occurred subsequently. An utter failure of justice will not unequivocally result if we fail to grant a new trial for consideration of the new tax transactions. Justice will best be served by requiring the Richardsons to accept responsibility for their financial obligations. In addition, the trial court's refusal to grant a new trial did not constitute an abuse of discretion merely based on its retention of jurisdiction. The trial court retained jurisdiction over the matter "to effectuate the relief awarded and to insure compliance with and enforcement of its judgments." By so doing, the trial court did not provide an open end to the controversy so the Richardsons could engage in post-judgment activities in an attempt to vacate the judgment against them. The Richardsons have provided this court with no authority indicating a court's retention of jurisdiction in a fraud case requires it to modify its ruling based on subsequent events. We therefore affirm the trial court's denial of the Richardsons' motion.

V. Conclusion

On appeal by the Richardson parties, individual and corporate defendants, we affirm with modification and remand for entry of judgments. On cross-appeal by plaintiffs, we reverse and remand for entry of judgment.

**APPEAL AFFIRMED AS MODIFIED AND REMANDED; CROSS–APPEAL REVERSED AND REMANDED.**