# IN THE SUPREME COURT OF IOWA

No. 18–0296

Submitted January 21, 2021—Filed March 19, 2021

**BILLY DEAN CARTER, BILL G. CARTER,** and the **ESTATE OF SHIRLEY D. CARTER,** by and through **BILL G. CARTER,** Executor,

Appellees,

vs.

**JASON CARTER,**

Appellant.

Appeal from the Iowa District Court for Marion County, Martha L. Mertz, Judge.

The defendant appeals a judgment against him for his mother's death. **AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which all participating justices joined. Appel and Mansfield, JJ., took no part in the consideration or the decision of the case.

Allison F. Kanne (argued) of Wandro & Associates, P.C., Des Moines, and Christine E. Branstad (argued) and Nathan A. Olson of Branstad & Olson, Des Moines, for appellant.

Mark E. Weinhardt (argued) and David N. Fautsch of the Weinhardt Law Firm, Des Moines, for appellees.

**CHRISTENSEN, Chief Justice.**

In this case the defendant, Jason Carter (Jason), was civilly accused by his father, Bill Carter (Bill), and brother, Billy Carter (Billy), of intentionally shooting his mother, Shirley Carter (Shirley), and causing her death. Before the trial began, the Iowa Department of Criminal Investigations (DCI) agreed to share certain information from its investigation on the murder with the parties in response to a subpoena served on it by the plaintiffs. A jury determined Jason was civilly liable. The state then subsequently charged Jason with first-degree murder. As a result of discovery during that criminal proceeding, the state provided Jason with exculpatory evidence.

Jason appeals from his civil case and argues the district court erred by: (1) denying his motion for continuance until law enforcement decided whether to prosecute him; (2) denying his motion to quash the plaintiffs' subpoena to DCI; (3) denying his motion for judgment notwithstanding the verdict; (4) dismissing his first petition to vacate the judgment; (5) denying his motion for recusal; and (6) dismissing his second petition to vacate the judgment as time-barred. We conclude that the district court did not abuse its discretion in denying Jason's motion for continuance, judgment notwithstanding the verdict, first petition to vacate the judgment, and motion for recusal. Jason's motion to quash the subpoena to DCI was properly denied, and the district court judge lacked jurisdiction to hear his second petition to vacate the judgment because it was untimely.

## I. Background Facts and Proceedings.

Shirley farmed with her husband, Bill, in Marion County. Early in the morning of July 19, 2015, the couple left their farmhouse to get coffee together. Afterward, Bill dropped Shirley off back at the house. A neighbor saw Bill leave the home around 7:45 a.m. He was taking a load of corn in

a semitrailer to a processing facility about an hour drive away in Eddyville, Iowa. He arrived at the processing facility at 9:01 a.m. and left at 9:22 a.m. He stopped at a Casey's General Store in Lovillia, Iowa, at 9:54 a.m. and then drove to a farm where he rented land to reload his semitrailer with corn. As Bill was driving back home, he received a call from his daughter, Jana Lain, telling him that Jason called her and said he found Shirley dead at the home but he wouldn't call 911. Bill called 911 as he rushed back to the house.

Jason is a farmer like his parents and was also taking a load of corn to Eddyville that morning. His truck was seen exiting the processing facility at approximately 9:58 a.m. He went to a different farm, where he sometimes parked, to drop off his tractor trailer. He then drove his pickup truck back to his parents' home. Jason called his sister at 11:08 a.m. to tell her that their mother was dead in the home. He called 911 at 11:11 a.m. and told the operator his mother was dead and that she seemed to have been on the floor for two hours. He also stated there was a hole through the floor and in the refrigerator. At some point, Jason hid the second cell phone he had for texting a woman he was having an affair with in the engine compartment of his vehicle. Bill arrived at the house shortly after Jason called 911. It was later determined that Shirley had been fatally shot twice.

Shirley's family was allowed back into the farmhouse two days after her death. The family found evidence DCI had missed, including a gun safe stored in the basement of the house. One gun was missing from the safe—a .270 Remington high-powered rifle. DCI collected the gun safe. Investigators determined that the bullet fragments collected from the crime scene had been fired from a high-powered rifle. Bill had shot the missing .270 rifle into an earthen bank once, and law enforcement was able to

recover bullets from the location. A criminalist concluded that the fragments from the crime scene were consistent with coming from a high-powered rifle in the .270–.280 caliber range. The missing rifle has not been located to date. Jason told law enforcement that he had never touched the gun safe or known his parents had one until Shirley's death. Bill on the other hand thought Jason and his wife had given the gun safe to him as a gift. Ultimately, Jason's fingerprints were found on the gun safe. The location of some of the fingerprints was consistent with that of someone assembling the gun safe.

On January 5, 2016, approximately six months after Shirley's death, the plaintiffs Bill and Billy, through the Estate of Shirley Carter, filed this suit against Jason and alleged he shot her causing her death. At this point no criminal charges were pending. On July 5, the plaintiffs served a subpoena to DCI requiring it to produce the entire law enforcement investigation file on Shirley's homicide. DCI filed a motion to quash the subpoena. On April 17, 2017, the plaintiffs met with DCI to discuss whether they would be willing to produce certain information. DCI agreed to produce certain documents to both the plaintiffs and Jason. The plaintiffs agreed to share information with DCI as well. As a result of the meeting, the plaintiffs served a second subpoena on DCI requesting the agreed-upon documents:

> 1. All documents, whether in print, audio, or video, reflecting or relating to any interview of or conversation with Jason Carter conducted by the DCI and/or the Marion County Sheriff's Office following the death of Shirley Carter on June 19, 2015.

> 2. All documents . . . relating to any interview of or conversation with Bill G. Carter conducted by the DCI and/or the Marion County Sheriff's Office following the death of Shirley Carter on June 19, 2015.

3. Any report . . . relating to any investigation by any agent of officer . . . regarding the level of grain contained in Bill G. Carter's semi-tractor trailer on June 19, 2015.

4. All documents reflecting or relating to cell phone text messages made to and from [certain phone numbers] on or around June 19, 2015.

5. All documents reflecting or relating to reports of the processing of, and photography of, the home and premises in which Shirley Carter's death apparently occurred on June 19, 2015 by DCI and/or the Marion County Sheriff's Office. This item includes but is not limited to any sketch, diagram, or map of the home and/or premises.

6. All documents reflecting or relating to reports of the collection of, and the analysis of, fingerprint evidence gathered and processed by DCI and/or the Marion County Sheriff's Office from the home and premises in which Shirley Carter's death apparently occurred on June 19, 2015.

7. All documents reflecting or relating to reports of the collection of, and the analysis of, firearms and/or ballistics evidence gathered and processed by DCI and/or the Marion County Sheriff's Office from the home and premises in which Shirley Carter's death apparently occurred on June 19, 2015.

8. Transcripts of the depositions taken pursuant to I. R. Crim. P. 2.5(6) of Shelly Carter, Chase Carter, Cecil Harry, and Ginger Harry.

9. All security or other video evidence depicting Bill G. Carter at Casey's General Stores outlets in or near either Lovillia, Iowa or Milo, Iowa on June 19, 2015.[1]

Jason moved to quash the subpoena. On August 18, the district court denied the motion to quash. On December 5, the day trial was scheduled to commence, Jason moved to continue the trial until law enforcement made a final decision as to whether criminal charges would be filed. The district court denied the motion for continuance.

The jury trial began as scheduled on December 5. At the close of the plaintiffs' case, Jason moved for a directed verdict on the plaintiffs'

---

[1]Based on the record, items number eight and nine were not produced to the parties.

negligence and battery claim. The district court granted his motion as to the negligence claim and denied his motion as to the battery claim. At the close of all evidence on the plaintiffs' battery claim, Jason moved for a directed verdict. The court denied this motion. On December 15, the jury found Jason civilly liable for Shirley's murder, and on December 18 he moved for judgment notwithstanding the verdict. On the same date, the state charged Jason criminally with first-degree murder. On February 14, 2018, the district court denied Jason's motion for judgment notwithstanding the verdict.

Beginning in February, the state provided Jason with discovery in the criminal case. On March 21, he was acquitted of murder. On May 30, Jason filed a petition to vacate the judgment based on newly discovered evidence. The court held a two-and-a-half-day hearing on the petition. On January 31, 2019, the district court dismissed the petition. On August 30, Jason filed a second petition to vacate the judgment based on newly discovered evidence. While this petition was pending before the judge, Jason filed a motion for the judge to recuse herself due to an allegation that the judge had told an attorney Jason "was guilty as sin" and was seen speaking ex parte to the plaintiffs' counsel in the courthouse during the civil trial. The district court denied Jason's motion for recusal and dismissed his second petition finding it lacked jurisdiction due to being filed past the one-year deadline contained in Iowa Rule of Civil Procedure 1.1013. Jason appeals to this court.

## II. Standard of Review.

We review a district court's denial of a motion for continuance for abuse of discretion. *State ex rel. Miller v. New Womyn, Inc.*, 679 N.W.2d 593, 595 (Iowa 2004). A party challenging a denial of a motion for continuance carries a heavy burden. *Id.* "Because evidentiary privilege in

Iowa is based on statute, our review is on error." *State v. Richmond*, 590 N.W.2d 33, 34 (Iowa 1999). However, we review the admissibility of evidence alleged to be privileged for an abuse of discretion. *State v. Anderson*, 636 N.W.2d 26, 30 (Iowa 2001). We review a district court's denial of a motion for judgment notwithstanding the verdict for correction of errors at law. *Crookham v. Riley*, 584 N.W.2d 258, 265 (Iowa 1998). Our review is limited to the grounds stated in the motion for directed verdict. *Johnson v. Dodgen*, 451 N.W.2d 168, 171 (Iowa 1990). We give a district court wide discretion in ruling on a petition to vacate the judgment or grant a new trial based upon newly discovered evidence and an abuse of discretion is needed for reversal. *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 109 (Iowa 2011). We review a judge's decision on a motion to recuse for abuse of discretion. *State v. Hoyman*, 863 N.W.2d 1, 7 (Iowa 2015). We review the district court's decision to dismiss Jason's second petition to vacate the judgment as untimely for correction of errors at law. *Mormann v. Iowa Workforce Dev.*, 913 N.W.2d 554, 565 (Iowa 2018); *Harrington v. Univ. of N. Iowa*, 726 N.W.2d 363, 365 (Iowa 2007).

### III. Analysis.

Jason claims the district court erred in the following ways: (1) by denying his motion for continuance until the criminal investigation concluded; (2) by denying his motion to quash the plaintiffs' subpoena to DCI; (3) by denying his motion for judgment notwithstanding the verdict; (4) by dismissing his first petition to vacate the judgment based on newly discovered evidence; (5) by denying his motion for recusal; and (6) by dismissing his second petition to vacate the judgment.

**A. Motion for Continuance.** The parties dispute whether error was preserved on this issue. The plaintiffs argue error was not preserved because the stated grounds for a continuance described to the district

court do not resemble the grounds presented on appeal. Specifically, the plaintiffs contend Jason moved for continuance at trial until law enforcement made a decision whether to prosecute, but on appeal takes the position that a continuance should have been granted because the evidence obtained from DCI was incomplete. The record shows that Jason's counsel "move[d] that this case be continued to such time as law enforcement makes a final decision or Ed Bull, the county attorney, makes a final decision as to whether this case will be prosecuted or not."

On appeal, Jason states that he moved for continuance until the homicide investigation concluded because he suspected there was significant exculpatory evidence held by DCI and because DCI provided only piecemeal inculpatory evidence to the parties. It is clear enough that the reason Jason had moved for a continuance of the trial until a decision was made whether to prosecute was because in a criminal case the government would be required to disclose exculpatory evidence to him. *See Harrington v. State*, 659 N.W.2d 509, 522 (Iowa 2003). Therefore, we determine the reason stated for the continuance at the time the motion was made and the reason for the continuance offered on appeal are sufficiently similar and error was preserved.

"A continuance may be allowed for any cause not growing out of the fault or negligence of the movant, which satisfies the court that substantial justice will be more nearly obtained." Iowa R. Civ. P. 1.911(1). A trial court's discretion in denying a continuance is "very broad." *State v. Grimme*, 338 N.W.2d 142, 144 (Iowa 1983) (quoting *State v. McNeal*, 261 Iowa 1387, 1393–94, 158 N.W.2d 129, 133 (1968)). We will not interfere with a trial court's ruling on a motion for continuance "unless it clearly appears that the trial court has abused its discretion, and an injustice has

resulted therefrom." *Id.* (quoting *State v. Elliston*, 159 N.W.2d 503, 509 (Iowa 1968)).

Jason has failed to show the trial court abused its discretion when it denied his motion for continuance until law enforcement made a decision whether to prosecute him for his mother's murder. The plaintiffs have two years to file a wrongful death suit, and there is no rule requiring trial courts to stay civil proceedings until criminal proceedings conclude. *See* Iowa Code § 614.1 (2015); *United States v. Kordel*, 397 U.S. 1, 12–13, 90 S. Ct. 763, 769–70 (1970) (determining that simultaneous and related civil and criminal proceedings did not violate the Constitution). It was speculative whether criminal charges would ever be filed against Jason. Although there may have been an ongoing investigation by law enforcement, Jason had no criminal charges pending against him for his mother's death at the time the civil suit was filed. If we were to overturn the district court's decision to deny the motion as an abuse of discretion, it may be necessary to continue every civil case where there is a possibility criminal charges may be filed from related facts. *See In re Mid-Atl. Toyota Antitrust Litig.*, 92 F.R.D. 358, 359 (D. Md. 1981) (describing defendant's request for a stay of a civil trial until completion of criminal proceedings where no criminal charges were pending as "unprecedented in its scope" and a "blanket stay in . . . speculative circumstances"). If the district court judge had granted Jason's motion to continue until law enforcement made a decision to file criminal charges, the continuance could have lasted far into the future. The plaintiffs may be disadvantaged by a delay until such unspecified time "as memories fade, witnesses become unavailable, and evidence is lost." *State v. Christensen*, 929 N.W.2d 646, 666 (Iowa 2019). The district court did not abuse its discretion in denying the motion for continuance.

**B. Motion to Quash.** The second issue on appeal is whether the district court abused its discretion in denying Jason's motion to quash the plaintiffs' subpoena to DCI. We must answer the question of whether Jason can use Iowa Code section 622.11 (2017) to prohibit the state from voluntarily disclosing portions of the DCI file. Iowa Code section 622.11 states that, "[a] public officer cannot be examined as to communications made to the public officer in official confidence, when the public interests would suffer by the disclosure." Jason takes an all or none approach and argues that the district court should have either granted his motion to quash or required all DCI evidence be provided to the parties. On the one hand, he claims the district court gave the plaintiffs an unfair advantage by allowing the state to provide segmented prejudicial evidence pursuant to a private agreement. On the other hand, Jason claims the state cannot waive the privilege in Iowa Code section 622.11 for use in civil trial.

The plaintiffs argue Jason has no right to prevent the state from producing information in response to a civil subpoena because section 622.11 does not confer any rights on a private citizen. Therefore, the plaintiffs claim Jason has no standing to quash the subpoena issued to DCI. Because we conclude that the official information privilege in Iowa Code section 622.11 cannot be invoked by a private citizen, we agree that Jason does not have standing to object to the subpoenas directed at DCI.

When the state claims official information privilege under section 622.11, the court must decide whether the public interests would suffer by the disclosure requested. *See Nizzi v. Laverty Sprayers, Inc.*, 259 Iowa 112, 119, 143 N.W.2d 312, 316 (1966). "An official claiming the privilege must satisfy a three-part test: (1) a public officer is being examined, (2) the communication was made in official confidence, and (3) the public interest would suffer by disclosure." *Hawk Eye v. Jackson,* 521 N.W.2d 750, 753

(Iowa 1994) (citing *State ex rel. Shanahan v. Iowa Dist. Ct.*, 356 N.W.2d 523, 527 (Iowa 1984)). This case presents the unusual situation where it is a private litigant, rather than the state, attempting to keep state information confidential. Both parties rely on *State ex rel. Shanahan v. Iowa District Court*, 356 N.W.2d 523, to support their argument.

In *Shanahan,* we determined that the district court had erred in requiring the state to produce its entire DCI file to the litigants in a wrongful death action in a double homicide case. *Id.* at 525. Initially the plaintiffs served a subpoena on the state compelling production of its entire investigatory file, but a temporary accommodation was reached where the state agreed to provide to both parties the officers' statements regarding the crime scene, medical examiners, a state-engaged locksmith, and lists of guests and employees at the hotel on the night in question. *Id.* at 526. The defendants then served their own subpoena compelling production of the entire DCI file. *Id.* The state asserted that the file was privileged under Iowa Code section 622.11. *Id.* at 527. We enforced the statutory privilege contained in section 622.11 and reversed the district court's order to disclose the entire DCI file. *Id.* at 31.

The present case is clearly different from *Shanahan,* because in this case the state did not object or assert any privilege to the plaintiffs' second, more focused, subpoena. Jason claims that the protection against disclosure of official information in section 622.11 does not turn on whether law enforcement decides to assert the privilege. We disagree. Iowa caselaw shows that only the state can claim the qualified privilege in section 622.11. *See id.* at 527, 529 (referring to the privilege created by section 622.11 as "the Governmental Privilege" and "the public officer privilege"); *Hawk Eye,* 521 N.W.2d at 753 ("An *official* claiming the privilege must satisfy a three-part test . . . .") (emphasis added); *Shannon v. Hansen,*

469 N.W.2d 412, 414 (Iowa 1991) (stating that section 622.11 creates "a public officer privilege for communications" and that *the state* must satisfy the three-part test to establish the privilege); *see also* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.501:2(B), at 436–37 (2020–2021 ed. 2020) (explaining that the government has the ability to claim the official information privilege under section 622.11).

Jason additionally claims the district court erred by not accounting for the public and private interests affected by disclosure of the evidence. This argument fails to recognize that the aforementioned three-part test and balancing of interests is only triggered by a claim of privilege by the state. The state did not assert the official information privilege in this case, so the district court was not required to balance the interests. Furthermore, nothing in our caselaw or the language of section 622.11 suggests the state may not voluntarily disclose information that would be covered by the official information privilege. In *Shanahan*, the state voluntarily disclosed several documents from its investigation, as noted above. 356 N.W.2d at 526, 531 ("The district court should have sustained the State's motion for a protective order to the extent that it sought to deny the civil litigants access to DCI file materials not already disclosed voluntarily to them.").

Jason's argument that the district court erred in denying his motion to quash relies largely on his contention that the plaintiffs were given an unfair advantage. However, our caselaw makes it clear the official information privilege does not work to protect Jason's interests. "The interest of the public—public safety—is at stake, not the interest of the officer or the person communicating in confidence." *Id.* at 527. It can similarly be stated that the interest at stake in section 622.11 is not the interest of a private litigant in a civil suit, such as in this case. *See* A. W.

Gans, Annotation, *Constitutionality, Construction, and Effect of Statute or Regulation Relating Specifically to Divulgence of Information Acquired by Public Officers or Employees*, 165 A.L.R. 1302 (1946) (stating that courts have pointed out that the official information privilege accorded by various jurisdiction's statutes is not for the benefit of parties to litigation). When the privilege is asserted, our courts balance "the *State*'s interest in confidentiality against the private litigants' interest in exhaustive discovery"—not the private litigants' interest in confidentiality. *Shanahan*, 356 N.W.2d at 525 (emphasis added).

The fact that a meeting between the plaintiffs and DCI occurred prior to the plaintiffs' service of the subpoena does not by itself indicate prejudice and unfairness to Jason. Rather, it shows the plaintiffs were following our rules of civil procedure that requires the parties to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Iowa R. Civ. P. 1.1701(4)(*a*); *see also id.* r. 1.501(3) ("Any discovery motion presented to the court must include a certification that the movant has in good faith personally spoken with or attempted to speak with other affected parties in an effort to resolve the dispute without court action."). For these reasons, we determine that Jason does not have standing to object to the plaintiffs' subpoena to DCI on the basis of Iowa Code section 622.11.

**C. Motion for Judgment Notwithstanding the Verdict.** Jason argues that the district court erred in denying his motion for judgment notwithstanding the verdict because the plaintiffs did not offer evidence sufficient for a reasonable mind to conclude Jason battered Shirley. At the close of the plaintiffs' case, Jason moved for a directed verdict on the issue of causation claiming there was not enough time for him to have shot his mother. Jason points to the video of his truck leaving the Cargill corn

processing facility at approximately 9:58 a.m. the morning of the murder. He claims he did not get to his parents' farm until around 11:00 a.m. at the earliest since it is an hour drive to his parent's home and he switched vehicles on the way. He argues there is no way for him to have shot his mother and hid the gun sometime between his 11:00 a.m. arrival and the time he called his sister at 11:08 a.m. to tell her Shirley was dead. He additionally points to the lack of direct evidence and argues the plaintiffs failed to offer evidence of a motive. We conclude that when viewing the evidence in the light most favorable to the plaintiffs, a reasonable mind could conclude by a preponderance of the evidence that Jason intentionally shot his mother.

A person is subject to liability to another for battery if that person acts intending to cause a harmful contact with the person of the other and a harmful contact results. *Nelson v. Winnebago Indus., Inc.*, 619 N.W.2d 385, 388 (Iowa 2000) (en banc). A motion for directed verdict or judgment notwithstanding the verdict should be denied if there is substantial evidence in support of each element of the plaintiffs' claim. *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477–78 (Iowa 1982). "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion." *Johnson*, 451 N.W.2d at 171. The district court is required to view the evidence in the light most favorable to the party against whom the motion is made, and we review the evidence in the same light. *Fiala v. Rains*, 519 N.W.2d 386, 387 (Iowa 1994). Circumstantial evidence is equally as probative as direct evidence. Iowa R. App. P. 6.904(3)(*p*). It is for the jury to determine the credibility of witnesses. *State v. Dudley*, 856 N.W.2d 668, 676–77 (Iowa 2014).

Timeline: Although evidence was presented that the window of opportunity for Jason to have shot his mother is tight, a reasonable mind

could determine he had time. Evidence was presented at trial that initially Jason told law enforcement investigators he may have arrived at his parent's home on the day of the murder at 10:45 a.m. or 10:50 a.m. Jason called his sister to tell her he found Shirley at 11:08 a.m. Using Jason's earliest estimate of 10:45 a.m. that would allow him twenty-eight minutes before calling his sister. Although Jason argues that he did not have time to drive from Cargill to his parents' home and shoot his mother before calling his sister, a fact finder could reasonably decide to find otherwise based on the timeline Jason first told law enforcement.

Furthermore, the plaintiffs presented evidence to support their theory that Shirley was still alive when Jason arrived at the farm. Bill testified he could tell Shirley had fed the pigs and put new sawdust down recently before her murder because the pigs were still eating when he arrived and had not yet played in the new bedding like they typically would. An expert testified that rigor mortis begins to take place in fifteen to thirty minutes after death in the small muscles of the neck. He stated that if a person lifted another by the neck after rigor mortis had set in the person would notice a stiffness and the head would come up like a board. Bill testified that when he got to the house he went to Shirley and picked her head up and when he let go of her head, it went on its own back to the floor, thus leading a factfinder to reasonably believe rigor mortis had not yet set in Shirley's neck. Furthermore, the plaintiffs put on evidence that accounted for Bill's whereabouts during the time the murder could have occurred thus leading a juror to conclude he could not be responsible.

Evidence: Both the plaintiffs' and defendant's experts who testified to the condition of the crime scene agreed that the scene at the house was consistent with a staged burglary. The plaintiffs' expert additionally testified it was likely Shirley knew her killer. When Jason's expert was

asked whether anything led him to believe the burglary was staged, he replied, "[F]or someone with my background and experience, you look at these things -- and this is red flags right off the bat." Shirley's purse was in plain view and undisturbed. Guns, money, pill bottles, and a blank checkbook were left behind at the crime scene. The only item discovered to be missing from the home was the .270 Remington rifle. Law enforcement recovered shell fragments from the crime scene and presented evidence that the fragments had been fired from a high-powered rifle like the one missing from the home. For comparison, agents were able to recover bullet fragments from an earthen bank where Bill had previously fired the missing rifle. A DCI agent testified that the fragments that killed Shirley matched the make and model of the missing rifle. Additionally, law enforcement investigators were not able to find any shell casings from the shooting. An expert testified that the absence of shell casings indicates the murderer made sure to pick them up so they could not be matched back to a particular weapon.

In support of the plaintiffs' case, Bill testified that the missing rifle had been stored in a gun safe in the basement of the home. A lab report determined that Jason's fingerprints were found on the gun safe even though he had told law enforcement he never touched it. Evidence was also presented that Jason had access to the gun in the time leading up to the murder. Bill testified that Jason and his family normally came over once or twice a week, but the week leading up to the murder they came over six nights in a row. He further stated that each night Jason asked him and Shirley what their plans were for the next day. Bill told Jason the night before the murder that he would be in Eddyville the next morning unloading his truck of grain.

The plaintiffs additionally argued that Jason made statements to others that show he knew information about his mother's death that only the killer could know or that were designed to create an alibi. For example, Jason told the 911 operator that Shirley looked like she had been on the floor for two hours. An officer testified that when he arrived at the scene Jason said she had been shot. To the contrary, Bill testified that when he arrived at the house, he could not tell Shirley had been shot. Jason's brother, Billy, testified that on the day of the murder Jason asked him if he thought the killer "had to rack another round." Evidence was presented that a bolt-action rifle like the type law enforcement believed was used to kill Shirley is the only type of weapon where this is necessary. The plaintiffs argued to the jury that on the day of the murder, no one besides the killer could have known that a bolt-action rifle was used.

Motive: The plaintiffs were not required to prove Jason had a motive to kill his mother, only to prove by a preponderance of the evidence that he intended to shoot her. However, the plaintiffs did present evidence to support their theory that Jason had a financial motive to kill his mother. A witness testified Jason told him he could not farm with his father because of his mother. Bill also testified to a conversation he and Shirley had with Jason two months before her death. In the conversation, Jason asked why he did not own any ground, which prompted Bill to offer to sell him some land. Bill explained that Shirley was visibly angry by Jason's response that he did not want that particular ground because of deer.

The plaintiffs argued several pieces of evidence at trial that could lead a juror to believe Jason was struggling financially. For example, the plaintiffs presented Jason's Wells Fargo bank account statement for June of 2015, which showed he had assets of approximately $600 and total liabilities of approximately $180,000. They also showed Jason had $82.34

in his Wells Fargo bank account on June 18, and $42.04 in his farm's bank account on June 19. The plaintiffs further presented evidence that Jason owed $566,000 of principal on his line of credit in June and was less than $10,000 from reaching his maximum on the line of credit. Evidence also showed Jason listed his adjusted gross income was a loss of more than $180,000 in 2014 on his federal tax return. He reported to the Iowa Department of Revenue that his farm lost $190,000 that same year. Additionally, Jason testified he knew he would inherit all of his parents' land. The land was worth at least several million dollars. For these reasons, we conclude that the evidence was sufficient at trial for a reasonable mind to find by a preponderance of the evidence that Jason intentionally shot his mother.

**D. First Motion to Vacate the Judgment or Grant a New Trial.** Jason claims the district court erred in denying his first petition to vacate the judgment or grant a new trial on the basis of newly discovered evidence. The majority of Jason's newly discovered evidence consisted of law enforcement's investigative summaries of interviews with people who purported to have information that Shirley was killed by burglars looking for drugs. Jason argues that the newly discovered evidence points to entirely different parties as responsible for murdering Shirley. Additionally, he claims it shows law enforcement was biased against him and did a faulty investigation. The newly offered evidence also included photographs of Jason assembling the gun safe and audio recordings of Bill's interviews with law enforcement regarding rigor mortis.

A court may vacate a final judgment or order, or grant a new trial due to "[m]aterial evidence, newly discovered, which could not with reasonable diligence have been discovered and produced at the trial, and

was not discovered within the time for moving for new trial under rule 1.1004." Iowa R. Civ. P. 1.1012(6).

> A party seeking a new trial on such grounds must demonstrate three things: (1) the evidence is newly discovered and could not, in the exercise of due diligence, have been discovered prior to the conclusion of the trial; (2) the evidence is material and not merely cumulative or impeaching; and (3) the evidence will probably change the result if a new trial is granted.

*Benson v. Richardson*, 537 N.W.2d 748, 762 (Iowa 1995) (citing *In re D.W.*, 385 N.W.2d 570, 583 (Iowa 1986)). "[T]he term 'newly discovered evidence' refers to facts existing at trial time of which the aggrieved party was then excusably ignorant." *Wilkes v. Iowa State Highway Comm'n*, 186 N.W.2d 604, 607 (Iowa 1971).

The district court determined that the evidence offered by Jason was discovered after trial and could not have been discovered earlier. However, the district court stated it was debatable whether the evidence was material. It noted that much of the evidence offered was hearsay evidence that could only be used to impeach witnesses and would not be used substantively. Additionally, the district court noted that some of the evidence Jason wished to offer was not material to the outcome of the case because of its inconsistency with other known facts. The district court ultimately concluded that even if the newly discovered evidence were material it would not change the outcome because virtually all of the evidence was inadmissible hearsay. Jason contends the district court erred by finding that the newly discovered evidence was inadmissible hearsay and not material. He further argues the district court erred by failing to consider the effect of the plaintiffs' discovery violations in ruling on his petition for relief.

First, we address Jason's contention that the question before a trial court ruling on a petition to vacate the judgment or grant a new trial due to newly discovered evidence is whether it is possible the new evidence *might* have affected the outcome of the trial. Jason relies largely on a 1921 Iowa Supreme Court case that states if newly discovered evidence "presents material facts germane to the issue in controversy, which, considered with the evidence presented on the trial, might cause a jury to take the other view, then the motion should be sustained." *Henderson v. Edwards*, 191 Iowa 871, 873, 183 N.W. 583, 584 (1921) (citing *Dobberstein v. Emmet County*, 176 Iowa 96, 155 N.W. 815 (1916)). Jason notes that the "might" standard was upheld in a 1956 case, *Farmers Insurance Exchange v. Moores*, 247 Iowa 1181, 1190, 78 N.W.2d 518, 524–25 (1956). However, that case goes on to clarify that "[i]t is also elementary that a new trial should not be granted for newly discovered evidence unless a different result . . . is reasonably probable." *Id.* at 1190, 78 N.W.2d at 525 (quoting *Loughman v. Couchman*, 243 Iowa 718, 720, 53 N.W.2d 286, 288 (1952)). Our caselaw in more recent years has consistently followed the standard that a movant for a new trial based on newly discovered evidence must demonstrate that the new evidence will *probably* change the result if a new trial is granted. *See, e.g.*, *State v. Uranga*, 950 N.W.2d 239, 243 (Iowa 2020); *Tullis v. Merrill*, 584 N.W.2d 236, 242 (Iowa 1998); *Benson*, 537 N.W.2d at 762; *Mays v. C. Mac Chambers Co.*, 490 N.W.2d 800, 804 (Iowa 1992); *In re D.W.*, 385 N.W.2d at 583; *Yoder v. Iowa Power & Light Co.*, 215 N.W.2d 328, 335 (Iowa 1974); *State v. Compiano*, 261 Iowa 509, 518, 154 N.W.2d 845, 850 (1967). That is the standard we follow today.

Second, we address whether the evidence Jason offers in the first petition to vacate the judgment "is newly discovered and could not, in the

exercise of due diligence, have been discovered prior to the conclusion of the trial." *Benson*, 537 N.W.2d at 762.

> The showing of diligence required "is that a reasonable effort was made." The defendant is "not called upon to prove he sought evidence where he had no reason to apprehend any existed." However, a defendant "must exhaust the probable sources of information concerning his case; *he must use that of which he knows*, and *he must follow all clues* which would fairly advise a diligent man that something bearing on his litigation might be discovered or developed."

*Uranga*, 950 N.W.2d at 243 (citations omitted) (quoting *Compiano*, 261 Iowa at 519, 154 N.W.2d at 850). The district court determined that the DCI interview summaries were newly discovered and could not have been produced at trial. The court reasoned that "[a]lthough defense counsel had reason to know other persons were implicated in the murder, the actual evidence of those allegations was not available to Jason at the time of trial." The district court also concluded that the evidence could not have been discovered earlier by Jason because he did not have access to DCI's entire investigative file.

Exculpatory evidence that is unavailable, but known, at the time of trial is not newly discovered evidence. *Jones v. Scurr*, 316 N.W.2d 905, 910 (Iowa 1982). We are not convinced Jason exhausted all probable sources of information concerning his case. An audio recording of a meeting on November 28, 2017, with Jason's counsel and Detective Reed Kious shows Detective Kious told them information about his other investigations on other people. He stated,

> It's always the story of either Joel [Followill], or his brother John, or some other person that's involved in drugs in some way, burglarized Shirley's house. The most believable one that I heard came from Adam Glover, and usually whenever somebody approaches me, and I won't say usually, it is always when somebody approaches me, there's something they want in return which is common for people in that lifestyle . . . . this Adam Glover said that he heard that Shirley had confronted

the burglars with the gun and that a struggle ensued, she was shot, and that the second shot was done to finish her off. And that this Joel Followill was part of it.

Detective Kious went on to explain several reasons why he did not find this story believable. Jason argues this excerpt shows it was reasonable to accept Detective Kious's representation that one person had come forward with this story, that it was not credible, and to move on. He also claims in his brief that "no one provided Jason with the names of the Followills." We disagree. This recording shows that Jason's counsel was aware before trial that law enforcement had been approached *more than once* with information on Shirley's death and it is always a story involving Joel or John Followill or someone else burglarizing the Carter's home.

Jason asserts there was no point in attempting to obtain the DCI file because DCI was clearly unwilling to provide the investigation file as evidenced by its motion to quash the plaintiffs' first subpoena. However, after Jason was provided with a portion of DCI's investigatory file, he made no attempt to subpoena DCI for the balance of its investigative file or specifically for interviews on other suspects. Jason claims he exercised due diligence when his counsel later asked Detective Kious in the November 28 meeting "if there was anybody else" other than Joe Tony Vrban and the Followill brothers.

Due diligence in the context of newly discovered evidence requires that the movant exhaust all probable sources. The above question posed to Detective Kious does not rise to that standard. Courts must require a movant to show timely due diligence in the discovery of new evidence, otherwise "newly discovered evidence might be withheld as trial strategy to obtain a second trial if needed." *Compiano*, 261 Iowa at 518, 154 N.W.2d at 850. Because Jason did not make any attempts to obtain more

information from law enforcement or investigate leads for himself, he did not exercise due diligence in timely discovering the evidence he now offers.

Third, we address Jason's argument that the district court abused its discretion in finding the evidence was not material because of its inconsistency with other facts of the case. In determining that some of the evidence was immaterial because of its inconsistency with the evidence at trial, the district court noted that the experts for both the plaintiffs and for Jason expressed the opinion that the person who shot Shirley was not a burglar and the home was staged to look like a burglary. The court went on to explain in its order on Jason's petition to vacate the judgment that virtually every story provided by Jason pointing to other suspects was based on burglars going to Shirley's home looking for prescription drugs and ending up killing her. Thus, the district court determined the newly discovered evidence was inconsistent from the evidence introduced at trial in support of Jason's theory of the case. In *State v. Smith*, we upheld a district court's decision that newly discovered evidence would not have changed the outcome of the trial when the evidence "was not consistent with defendant's theory of the case." 573 N.W.2d 14, 21–22 (Iowa 1997) (explaining that defendant's theory at trial was that he was present in the park where the shooting occurred but did not fire a gun, yet the newly discovered evidence consisted of testimony that he was not seen at the park at the time of the shooting). Some of the stories are also clearly inconsistent with the crime scene. They state Shirley was beaten or put in a pond before her death yet there were no signs of this on her body.

The district court did not abuse its discretion in determining the statements Jason wished to offer to prove that burglars were responsible for Shirley's death that were clearly not true were not material to the outcome in the trial. However, the district court ultimately denied Jason's

petition to vacate the judgment or grant a new trial because it determined the new evidence would not change the outcome. Therefore, we will focus our review there.

Lastly, Jason argues the district court erred in determining the new evidence would not change the outcome of the trial because most of it is inadmissible hearsay. Hearsay is a statement that a declarant makes not while testifying at the current hearing or trial and a party offers into evidence to prove the truth of the matter asserted in the statement. Iowa R. Evid. 5.801. Hearsay is normally inadmissible. *Id.* r. 5.802. The vast majority of Jason's newly discovered evidence consists of law enforcement's summaries of interviews of people who allege they spoke with others who spoke with the alleged killers. Jason claimed in his petition to vacate the judgment that the newly discovered evidence points to entirely different parties as responsible for murdering Shirley. The statements in the interview reports are clearly hearsay if they are being offered to prove the truth of the matter asserted in the statements.

Jason's claim that the reports meet the residual hearsay exception is not persuasive. The residual exception to the hearsay rule provides:

> *a. In general.* Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in rule 5.803 or 5.804:
>
> (1) The statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) It is offered as evidence of a material fact;
>
> (3) It is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) Admitting it will best serve the purposes of these rules and the interests of justice.

*Id.* r. 5.807(*a*). The first prong of rule 5.807 is not satisfied because the statements contained in the interview reports Jason offers do not have "equivalent circumstantial guarantees of trustworthiness" for several reasons. The district court noted in its order denying Jason's petition to vacate the judgment that the information gleaned from the interviews is widely unreliable and involves multiple levels of hearsay:

> Despite claims by persons purportedly having spoken directly with people involved in the murder, neither the DCI nor the Marion County Sheriff's Office were able to corroborate these allegations. Based on the evidence presented, the Court finds most of the individuals claiming to have information about Shirley Carter's death were themselves incarcerated in the Marion County Jail or facing criminal charges and looking "to make a deal." Much of the information investigators received from these individuals was incomplete, inconsistent with facts garnered from the crime scene, or refuted by ancillary interviews with people named during the initial interview.

The district court went on to say,

> One individual repeatedly maintained he had or could get information about Shirley Carter's murder. Facing his own criminal charges, this "informant" wanted the charges against him dismissed in exchange for what he knew or, at the very minimum, substantially reduced. He told investigators he had spoken with one of the murderers, he claimed there were two, and one of the alleged killers admitted to involvement in the murder. Upon further questioning, he back-peddled, saying the killer he spoke with did not "tell me, tell me" about committing the murder, but inferred involvement in the killing. This same "informant" told law enforcement the killers took Shirley down to the pond where they attempted to scare her in what can only be described as a "water boarding" incident. However, Shirley's body was not wet nor damp when found and the medical examiner's report does not suggest water was in any way related to her death. While this individual probably told the most implausible stories, his style was typical of others who sought to improve the person's own situation by providing so-called information about Shirley Carter's murder.

Upon our review of the interview summaries, we agree that most of the information disclosed in them is uncorroborated, incomplete, refuted by

others, or implausible based on the known facts of Shirley's death. Even where the person speaking to law enforcement was noted as seeming earnest, their statement often involved at least another level of hearsay, meaning they heard it from someone who heard it from someone else. The statements do not meet the reliability requirement for the residual exception.

Furthermore, we are not persuaded that the seemingly large number of reports pointing to other suspects alone would change the outcome of the trial. Jason's first petition to vacate the judgment included law enforcement's interview summaries with approximately fourteen different people who suspected or heard the Followill brothers were involved in Shirley's death.[2] However, some of the people that spoke with law enforcement had the same person as their source of information. They all appear to be from the same friend group or acquaintances of each other. For these reasons, the district court did not abuse its discretion in concluding the interview summaries would not have changed the outcome of the trial.

Jason additionally argues that the statements in the investigative reports are not hearsay because they would not be offered to prove the truth of the matter stated. Rather, Jason claims that he would offer the evidence to show law enforcement's investigation was faulty or failed because it failed to interview certain leads. He also contends the evidence shows law enforcement's extreme bias and tunnel vision by ignoring exculpatory evidence and unwillingness to consider other suspects. The court noted that Jason's new evidence shows law enforcement did in fact

---

[2]Some of the interviews occurred after judgment was rendered in the civil trial and thus are not "newly discovered evidence" which existed at the time of trial. *See Benson,* 537 N.W.2d at 762–63 (considering subsequent events as newly discovered evidence only in extraordinary cases in which an "utter failure of justice will unequivocally result").

consider other suspects. The new evidence mostly consisted of law enforcement's summaries of interviews with people alleged to have information on other suspects, including polygraph results from someone Jason had a dispute with prior to Shirley's murder. Additionally, the district court again emphasized that virtually all of the statements on other suspects are varied stories of a burglary gone wrong, yet the evidence presented by the plaintiffs as well as Jason in the civil trial was that the burglary was staged. Ultimately, the district court concluded law enforcement did a thorough investigation and "at some point, continuing to interview individuals involved in the drug world with no first-hand knowledge and whose story will contravene the facts from the crime scene becomes problematic." We are persuaded that the district court did not abuse its discretion in determining the evidence, if offered to show law enforcement's bias or faulty investigation, probably would not change the outcome at a new trial.

Finally, we address Jason's claim that the district court erred by failing to consider the effect of the plaintiffs' nondisclosure of material evidence. Jason alleges in the petition to vacate the judgment that the plaintiffs were aware of exculpatory evidence before the civil trial and did not disclose it in discovery. He points to his civil deposition where the plaintiffs' counsel asked him about the Followill brothers and a woman purported to have information. He also points to a Washington Post article that states the plaintiffs' counsel said they "had long been aware of the other suspects from early in the investigation but said they were discounted as possibilities based on 'a complex analysis of lots of factors' " and quotes the plaintiffs' counsel as stating that "[t]here is nothing of substance new to our side in this motion." *Iowa Man Accused in Mother's Death Points to Other Suspects*, AP News, (May 31, 2018),

https://apnews.com/238963d3c54d412782e0d8b5d5b923ab#:~:text=Io wa%20man%20accused%20in%20mother%E2%80%99s%20death%20po ints%20to,another%20suspect%20shot%20her%20during%20a%20farm house%20robbery [https://perma.cc/FQ8K-HBGK]. Jason also claims the plaintiffs did not disclose photos Bill had in his basement of Jason assembling the gun safe.

Contrary to Jason's brief, the district court directly addressed the alleged discovery violations in its ruling and order on Jason's motion to enlarge or amend its ruling on his petition to vacate the judgment. Ultimately the district court found the plaintiffs' counsel did not act improperly because Jason never made any effort to pursue any of the alleged discovery violations by filing a motion or requesting a hearing. *See* Iowa R. Civ. P. 1.517(1) ("A party, upon reasonable notice to other parties and all persons affected thereby, may move for an order compelling disclosure or discovery . . . to compel a discovery response.").

Apart from the fact that Jason never filed anything on the alleged discovery violations, it is clear Jason was aware of other suspects before the civil trial from an audio recording of an interview between Jason's counsel and a detective on Shirley's case. The detective discussed the two names repeatedly brought up as Shirley's killers in Jason's newly discovered evidence and the name of another person supposedly with information. The detective further told Jason's counsel that his investigation on other suspects is always a story of someone involved in drugs burglarizing Shirley's house. Thus Jason's claims that he had no information about other suspects, was prejudiced by the plaintiffs' nondisclosure, and would have completely changed his trial strategy but for their nondisclosure cannot be given much weight. Furthermore, the plaintiffs' counsel's statement to the press is not proof of a discovery

violation, rather it is an acknowledgement that they were aware of other suspects (just as Jason was) and did not believe there was anything new *of substance* in the law enforcement interview summaries that Jason was now offering.

The district court concluded that the photos of Jason and the gun safe would not change the result in a civil case, because the significance of Jason's fingerprints on the gun safe was not that they were there without a reasonable explanation. An expert testified that Jason's fingerprints were consistent with an assembly of the gun safe. Bill also maintained at trial that he believed Jason had given it to him as a gift in the early 2000s. Rather, the significance of the fingerprint evidence was that Jason had told law enforcement in an interrogation shortly after the murder he had never touched the gun safe and did not even know his parents owned one at the time of the murder. The district court additionally determined that the recording offered by Jason of Bill's discussions with law enforcement regarding rigor mortis would not change the result in a civil case. In the recording, Bill questions why law enforcement is focusing on the family and states Shirley's body was in rigor mortis. The district court reasoned that the recording would not change the outcome of the case because Bill is not an expert on rigor mortis, he lacks the training to offer an opinion on the subject, and he sounded upset and frustrated. We cannot conclude the district court abused its discretion in refusing to vacate the judgment or grant a new trial on the basis of these alleged discovery violations or the newly discovered evidence Jason offered.

**E. Motion to Recuse.** Jason filed a motion for recusal of the district court judge who presided over the civil trial and Jason's first petition to vacate the judgment. At the time he filed the motion for recusal,

Jason's motion to enlarge the district court's order denying his first petition to vacate the judgment and his second petition to vacate the judgment were pending before the same judge. Jason's motion for recusal is based on two events he argues show prejudicial bias against him. Jason provided an affidavit of an attorney that states she spoke to the judge following Jason's acquittal from his criminal trial and the judge told her "Jason Carter was guilty as sin." Jason provided another affidavit of an individual that states he attended portions of Jason's civil trial and during the trial witnessed the judge, the plaintiffs' attorneys, and the county attorney who charged Jason with murder speaking alone in the library of the courtroom without Jason's attorneys present.

"A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ." Iowa Code of Judicial Conduct R. 51:2.11(A); *see also* Iowa Code § 602.1606(1)(*a*) (2020) ("A judicial officer is disqualified from acting in a proceeding . . . if . . . [t]he judicial officer has a personal bias or prejudice concerning a party."). The Iowa Code of Judicial Conduct, Terminology, defines impartiality as "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." Actual prejudice must be shown before recusal is necessary, and speculation is not sufficient. *State v. Biddle*, 652 N.W.2d 191, 198 (Iowa 2002). The test is "whether reasonable persons with knowledge of all facts would conclude that the judge's impartiality might reasonably be questioned." *State v. Mann*, 512 N.W.2d 528, 532 (Iowa 1994). The party seeking disqualification must show that the judge's "alleged bias and prejudice must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from participation

in the case." *State v. Bear*, 452 N.W.2d 430, 435 (Iowa 1990); *see also State v. Farni*, 325 N.W.2d 107, 110 (Iowa 1982) (determining judge's statement that defendant "was guilty of something" was based on reviewing the minutes of testimony and was not from an extrajudicial source); *State v. Smith*, 242 N.W.2d 320, 324 (Iowa 1976) ("[O]nly personal bias or prejudice, as distinguished from judicial predilection, constitutes a disqualifying factor.").

Jason has not offered any evidence that the judge's alleged bias stems from an extrajudicial source. Additionally, Jason does not claim any biased conduct of the judge during the course of the trial, the hearing on his first petition to vacate the judgment, or in the rulings on Jason's posttrial motions. The district court's order denying the motion provides in part:

> Any opinion formed by this Court was formed only after hearing the evidence. This Court received no extrajudicial information and had no contacts with persons that influenced its ability to be impartial. Further, this Court prides itself on being even-handed with all parties during any proceeding and Jason Carter's trial was no exception.

The district court further noted that at the time of the alleged statement to the lawyer who provided an affidavit, the district court had already ruled on Jason's first petition to vacate the judgment, which was prior to the criminal trial.

Jason additionally has not alleged any prejudice that has resulted to him from the conversation the judge is alleged to have had in the courtroom library with the plaintiffs' counsel and the county attorney. *See State v. Lemburg*, 257 N.W.2d 39, 46 (Iowa 1977) (determining the record did not show any basis to disqualify the judge when ex parte discussions were limited to matters of security at trial and did not concern a pending or impending proceeding). The judge stated in her order:

[T]his court would not and did not discuss anything about the pending civil case without involving both sides. The rules do not prohibit talking to attorneys ever, just in those situations where there is discussion of a pending or impeding matter before the court. That did not occur here. Defendant's attempt to imply a conspiracy among Plaintiffs' counsel, the county attorney, and this Court is unsupported by any facts and farfetched.

"[T]here is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is" because of the "ever mounting sea of litigation." *Mann*, 512 N.W.2d at 532 (first quoting *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987) (per curiam); then quoting *Brody v. President & Fellows of Harvard Coll.*, 664 F.2d 10, 12 (1st Cir. 1981) (per curiam)). The civil trial lasted two weeks and the proceedings on Jason's first petition to vacate the judgment lasted two and a half days. A new judge assigned to the case would cause additional delay. The judge's rulings and orders filed in this case were thorough and based in the law. We decline to hold that the district court abused its discretion in denying Jason's motion to recuse.

**F. Second Petition to Vacate the Judgment or Grant a New Trial.** The final issue we must decide is whether the district court erred by dismissing Jason's second petition to vacate the judgment based on newly discovered evidence because it was filed outside the one-year limitation in Iowa Rule of Civil Procedure 1.1013.[3] Jason's second petition to vacate the judgment was filed under Iowa Rules of Civil Procedure 1.1012 and 1.1013. The official comments to Rule 1.1013 state:

> Rule 253 [now 1.1013] limits the time for filing the petition under Rule 252 [now Rule 1.1012]. Such time is jurisdictional; the court being without power to entertain a

---

[3]"A petition for relief under rule 1.1012 . . . must be filed and served in the original action within one year after the entry of the judgment or order involved." Iowa R. Civ. P. 1.1013(1).

> petition filed thereafter: *Kern v. [Woodbury County]*, 234 Iowa
> 1321, 14 N.W.2d 687.  Nothing can extend the time.

Iowa R. Civ. P. 1013 cmt. (first and second alterations in original).  Jason claims the district court erred in refusing to apply doctrine of equitable tolling to his petition to vacate the judgment.  Equitable tolling is appropriate in particular cases, but policy underpinnings of certain statutes, such as jurisdictional statutes of limitations, weigh against application of equitable tolling doctrines.  *Mormann*, 913 N.W.2d at 569 (citing *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451–53 (7th Cir. 1990)) (explaining that the Iowa Civil Rights Act does not have underlying policy rationales that cut against the application of equitable tolling unlike other certain statutes).

Jason points to *Sorenson v. Sorenson*, 254 Iowa 817, 119 N.W.2d 129 (1963) for support that the court may apply doctrine of equitable tolling to his second petition to vacate the judgment.  In *Sorenson*, we explained that courts of equity may grant new trials independently of the statute of limitations set out in statutes and rules like rule 1.1013 when the grounds for the motion were not discovered within the year and the fraud authorizing the granting of a new trial was extrinsic or collateral to the matter directly involved in the original case.  *Id.* at 825, 134.  The difference between Jason and the movant in *Sorenson* is that the movant there did not, and could not, file his motion to vacate the decree under rule 1.1013.  *Sorenson*, 254 Iowa at 824–25, 119 N.W.2d at 133–34 ("Defendant cannot bring himself within the provisions of rules [1.1012] and [1.1013] because he did not act within the one-year limit therein provided . . . .").  Instead, the movant sought to vacate or modify the decree upon equitable grounds.  *Id.*  We noted in *City of Chariton v. J. C. Blunk Construction Co.*, 253 Iowa 805, 821, 112 N.W.2d 829, 837 (1962), that we

have a string of cases that treat a petition to set aside a judgment on the ground of fraud not discovered until past the one-year period allowed by rules 1.1012 and 1.1013 as being a collateral attack on the judgment. We stated that "it is collateral only in that it is not brought in the original proceeding but is an independent action in equity." *Id.* Thus, those cases are likewise distinguishable from the present case since Jason did not bring an independent action in equity.

We made it clear in *In re Marriage of Fairall*, 403 N.W.2d 785, 788 (Iowa 1987), that a petition filed under rules 1.1012 and 1.1013 must be filed within a year:

> District court authority in these situations cannot be conferred by consent, waiver, or estoppel. Accordingly, we have stated: "Jurisdiction does not attach, nor is it lost, on equitable principles. It is purely a matter of statute." It follows that a petitioner seeking relief under rule [1.1012] bears the burden to follow the prescribed procedural steps of rule [1.1013] necessary to keep his or her post-judgment rights alive.
>
> We thus hold that to invoke the power of the district court to correct, vacate, or modify a final judgment or order through a rule 252 petition, the petition must be filed and the notice must be served within one year as required by rule 253.

(citations omitted) (quoting *BHC Co. v. Bd. of Review*, 351 N.W.2d 523, 526 (Iowa 1984)). We affirm this holding and conclude the district court lacked jurisdiction to hear Jason's second petition for relief because it was not filed within one year of the judgment as required by rule 1.1013.

**IV. Conclusion.**

For these reasons we affirm the judgment against Jason Carter.

**AFFIRMED.**

All justices concur except Appel and Mansfield, JJ., who take no part.